THE UNITED STATES, PLAINTIFFS IN ERROR, *v.* JEHIEL BROOKS AND
OTHERS, DEFENDANTS.

A supplementary article to a treaty between the United States and the Caddo In-
dians, providing that certain persons " shall have their right to the said four leagues
of land reserved for them and their heirs and assigns for ever.  The said lands to
be taken out of the lands ceded to the United States by the said Caddo nation of
Indians, as expressed in the treaty to which these articles are supplementary.  And
the four leagues of land shall be laid off," &c., — gave to the reservees a fee sim-
ple to all the rights which the Caddoes had in those lands, as fully as any patent
from the government could make one.  Nothing further was contemplated by the
treaty to perfect the title.

THIS case was brought up, by writ of error, from the Circuit
Court of the United States for the District of Louisiana.

The facts are very fully set forth in the opinion of the court,
to which the reader is referred.

It was argued by *Mr. Crittenden* (Attorney-General), for the
United States, and *Mr. Walker*, for the defendants.

*Mr. Crittenden* made the following points : —

I. That the first supplementary article of the treaty does not
make a grant or reservation in favor of the Grappes of four
leagues of land, but the true meaning and import is simply
that the Grappes shall have *their right*, whatever it may be, to
the four leagues of land stated as being reserved to them in
1801, in the preamble ; and there was, therefore, error in the
refusal of the court to give the first instruction prayed for.

This, it is contended, is the true construction.   The language
of the second supplementary article, relating to the donation to
Edwards, is very different in its terms, and imports a present
grant.   " There *shall be reserved* to Larkin Edwards, &c., one
section of land."

II. That the recital of the reservation to the Grappes, in
1801 does not relieve the defendants from producing the pri-
mordial title on which they must rely, and the court, therefore,
erred in refusing to give the second instruction prayed for, and
in charging as it did on this point under the second head of the
charge as given.

The law of Louisiana, borrowed from the civil law, is
against the court below.   The 2251st article of the Code de-
clares that " recognitive acts do not dispense with the exhibi-
tion of the primordial title, unless its tenor be there specially
set forth."   In this case its tenor is not set forth, and the pri-
mordial title must therefore be produced.   The recognitive act
is no proof of the contents of the primordial, even when the
latter is fully set forth, unless it also be shown that the latter

is lost. 1 Evans's Pothier, §§ 742, 743, p. 443; Brooks v. Norris, 6 Rob. 181.

But had the Spanish authorities in 1801 any power to authorize and sanction the reservation? That they had no such power has been decided many times in this court, in the case of the Perdido boundary. The country embraced within the limits of Louisiana, west of the Mississippi, stretched far beyond even the Sabine, and it was not until the treaty with Spain of 1819, that the United States relinquished their claim to it, and ceded what lay west of that river to Spain. The United States claimed it from the first. In the act of 20th February, 1811 (2 Stat. at Large, 641), to authorize the people of the Territory of Orleans to form a State government, the Sabine is declared to be the western boundary of the new State. Besides, it is to be remembered, that the fourteenth section of the act of 26th March, 1804 (2 Stat. at Large, 287), declares that all grants, and every act and proceeding subsequent to the treaty of St. Ildefonso, of whatsoever nature, towards the obtaining of any grant, title, or claim to land in Louisiana, under whatsoever authority transacted or presented, shall be null and void.

In addition to all this, it may here be mentioned that the Caddoes themselves never claimed Rush Island, or ever used it in any way. It was occupied by whites, and was never intended by the Caddoes to be included in the treaty or given to the Grappes.

III. That by the law of Spain the Caddo Indians had no primitive title to any land, and had no power to alienate without consent of the Spanish authorities; and these authorities at Natchitoches had no right to sanction the donation mentioned in the preamble and supplementary article. Mitchel et al. v. The United States, 9 Pet. 714. The Spanish officers at Natchitoches had no control over the Caddoes, the territory they inhabited being within the jurisdiction of the post of Nacogdoches. See 2 Martin's History of Louisiana, 202, 203, 261, 262; see also House Doc. No. 49, 1st Session, 24th Congress.

IV. That there was error in the court refusing to give the fourth instruction prayed for, because the matters therein mentioned were part of the history and public archives of the country, on which it was the duty of the court to inform the jury. See the state papers above referred to.

V. That the court erred in refusing to give the fifth instruction prayed for, and in charging as in the third point of the charge given.

VI. That if there is no title in Brooks, there can be none in the purchasers under him

VII. That the court erred in not admitting as evidence in the cause the letter of General Cass to Mr. Garland, of the 17th-of March, 1836, and the memorial of the Caddoes to the Senate of the United States, of the 19th of September, 1837, and the report of the House and depositions therein, and in the case of Brooks *v*. Norris; and in admitting copies of the affidavits of David, Trichel, and D'Ortlont.

*Mr. Walker's* points were as follows: —

1. Defendants' title rests upon a grant by treaty to the Grappes, a *bonâ fide* sale by them to Jehiel Brooks, and a *bonâ fide* sale of part of the land by him to the other defendants. The treaty of 1st July, 1835, being ratified and con'irmed by the President and Senate, becomes the supreme law, and cannot be set aside by the courts, on any ground whatever, not even upon an allegation of fraud. Const. U. S., art. 6, § 2; Story on Const., 684, 686; Foster & Elam *v*. Neilson, 2 Peters, 254, 306, 307; 6 Peters, 711, 738; 3 Peters's Digest, 654, 655, Nos. 1, 4, 6, 8, 11, and 12; 1 Kent, 286, 287; 6 Cranch, 136, 139.

2. The boundaries of the Indian lands ceded to the United States by the treaty are fixed therein, and cannot now be disputed by either party thereto, nor can they be altered but by the consent of both parties; the right of the Indians to the lands ceded is admitted by the treaty, and by the general policy of the government in treating with them. Story on Const., 379 et seq., §§ 532, 535; 12 Peters, 516, 725; 14 Peters, 13, 14.

3. The boundaries cannot be varied by parol proof, because, —

1st. The United States are parties to the treaty, which is in writing, and cannot be varied or contradicted by them. 2 Peters's Digest, 234 et seq., Nos. 898, 903, 904, 909, 921, 922, 933.

2d. The treaty is part of the supreme law of the land, and cannot be varied or contradicted by parol proof. 2 Peters's Digest, 153, No. 35; 161, No. 128; 172, No. 238.

4. The treaty, by its terms, declared that the Caddo Indians had previously donated the lands in dispute to the Grappes, the defendants' vendors, and confirmed that donation to them; which treaty having the force of a law, it is equal in dignity and effect to a complete grant by the United States, and they cannot go beyond that grant. 9 Pet. 746; Johnson *v*. McIntosh, 8 Wheat. 571; 6 Peters, 342; 2 Howard, 344.

5. The motives that induced the President and Senate to ratify the treaty containing this grant, or the reasons, if any, that should have influenced them to reject that part of the treaty, are not proper subjects of inquiry in any court, but all

such acts must be received as conclusive on all subjects within the scope of their power. 6 Cranch, 129, 131; Story on Const. 567.

6. Congress cannot, by legislation in any form, divest a citizen of rights acquired under a treaty, or previous act of Congress. 6 Cranch, 132, 133, 135.

7. Brooks is a *bonâ fide* purchaser from the Grappes, who acquired a good legal title under the treaty, which title cannot be questioned by the grantors of his vendors. 6 Cranch, 133, 134; Story on Const. 567.

8. Fraud cannot be charged on Brooks, as United States commissioner, in negotiating the treaty, without charging the same on the President and Senate, for he was their agent, and they made his act their own by their confirmation of the treaty. Story on Const. 557.

9. Congress have not authorized the inquiry of *fraud* to be made, but expunged it from the House resolutions, 38. Resolution of Congress, 30th August, 1842 (5 Stat. at Large, 584).

10. The fact of Brooks having been commissioner to negotiate the treaty did not disqualify him from purchasing long afterwards, and when his functions had ceased, land reserved in said treaty, and such purchase is no evidence of fraud in negotiating the treaty. 2 Peters's Digest, 357; 3 Wash. C. C. R. 556 et seq.

11. The question of fraud was, however, submitted by the court to the jury, and decided in favor of the defendants, as appears by the record.

12. Report of commissioners, Doc. 1035, and record of Brooks *v.* Norris, not admissible. 1st. The depositions not taken in any suit nor in any issue joined before any judicial tribunal, nor any other tribunal having power to try or decide title to property. 1 Phil. Ev. 14 (and note 42), 378, 394, and 395; Const. U. S., art. 1, § 1; art. 2, § 1; art. 3, § 1 and 2; 2 Peters's Digest, 164, No. 153. 2d. Consent to read the testimony in Brooks *v.* Norris does not bind the parties to admit the testimony in this suit, which is between different parties, both plaintiff and defendants. 10 Martin, 91, 92; 6 Peters, 340, 341; 2 Peters's Digest, 229, No. 837; Ibid. 230, No. 850.

Mr. Justice WAYNE delivered the opinion of the court.

This is another chapter in our dealings with Indians, and it illustrates our character and theirs in such transactions. The case will be better understood from its history, than by the discussion of points which it suggests. After the narrative, our conclusion will be brief.

The case is brought up, by writ of error, from the Circuit Court of the United States for the District of Louisiana.

It was a petition filed by the United States in consequence of the passage of the following joint resolution of both houses of Congress, on the 30th of August, 1842 : —

" *Resolved,* &c., That the District Attorney of the United States for the Western District of Louisiana be, and is hereby, directed to institute such legal proceedings in the proper court as may be necessary to vindicate the right of the United States to Rush Island, which is alleged to have been improperly included in the limits of the lands ceded by the Caddo Indians to the United States, by the treaty of the 1st July, 1835, and reserved by said treaty in favor of certain persons by the name of Grappe." (5 Stat. at Large, 584).

The facts in the case were these.

On the 28th of January, 1835, the President of the United States received the following letter from the Caddo Indians : —

" *To his Excellency the President of the United States.*

" The memorial of the undersigned, chiefs and head men of the Caddo nation of Indians, humbly represents : —

" That they are now the same nation of people they were, and inhabit the same country and villages they did, when first invited to hold council with their new brothers, the Americans, thirty years (sixty Caddo years) ago ; and our traditions inform us that our villages have been established where they now stand ever since the first Caddo was created, before the Americans owned Louisiana. The French, and afterwards the Spaniards, always treated us as friends and brothers. No white man ever settled on our lands, and we were assured they never should. We were told the same things by the Americans in our first council at Natchitoches, and that we could not sell our lands to any body but our great father the President. Our two last agents, Captain Grey and Colonel Brooks, have driven a great many bad white people off from our lands; but now our last-named agent tells us that he is no longer our agent, and that we no longer have a gunsmith or blacksmith, and says he does not know what will be done with us or for us.

" This heavy news has put us in great trouble. We have held a great council, and finally come to the sorrowful resolution of offering all our lands to you, which lie within the boundary of the United States, for sale, at such price as we can agree on in council one with the other. These lands are bounded on one side by the Red River, on another side by Bayou Pascagoula, Bayou and Lake Wallace, and the Bayou Cypress; and on the other side by Texas.

" We have never consented to any reservation but one, to be taken out of these lands, and that was made a great many years ago. The Caddo nation then gave to their greatest and best friend, called by them Touline, but known to all the white people by the name of François Grappe, and to his three sons then born, one league of land each, which was to be laid off, commencing at the lowest corner of our lands on the Red River, (as above described,) and running up the river four leagues, and one league from that line back, so as to make four leagues of land. We went with our friend and brother Touline (otherwise Grappe) before the Spanish authority, and saw it put down in writing, and gave our consent in writing, and the Spanish authority ratified our gift in writing. But, before the Americans came, our brother's house was burned, and the writings we have mentioned were consumed in it. Touline (otherwise Grappe) was a half-blood Caddo; his father was a Frenchman, and had done good things for his son when a boy. When he grew to be a man, he returned among us, and continued near to us till he died. He was always our greatest counsellor for good. He was our French, Spanish, and American interpreter, for a great many years; our brother now is dead, but his sons live.

" We, therefore, the chiefs and head men of the Caddo nation, pray that the United States will guarantee to the sons now living of our good brother, deceased, Touline (otherwise Grappe), the whole of our original gift, — four leagues to him and to them; and your memorialists further pray, that your Excellency will take speedy measures to treat with us for the purchase of the residue of our lands, as above described, so that we may obtain some relief from our pressing necessities; and your memorialists, as in duty bound, will ever pray," &c.

This letter was signed by twenty-four chiefs.

Upon the back of this memorial, the President made the following indorsement.

" The President incloses to the Secretary of War the memorial of the Caddo chiefs, for his consideration, whether it will not be proper to appoint a commissioner, to obtain a complete cession of their lands to the United States. There will be about half a million of acres, it is supposed. Care must be taken in the instructions that no reservations shall be made in the treaty; and, if the request [for one of their friends] in the memorial be adopted at all, it must be in a schedule, which may be confirmed or rejected by the Senate, without injury to the treaty.

" *January* 28*th*, 1835.

" P. S. Will it not be well to ask an appropriation to cover this expense ?                                                A. J."

On the 30th of May, 1835, Jehiel Brooks, the Indian agent, commenced a negotiation with the Caddo Indians for the cession of their land, which continued until the 1st of July, when the following treaty was made, which was ratified by the Senate on the 26th of January, 1836, and proclaimed by the President on the 2d of February, 1836.

" Andrew Jackson, President of the United States of America, to all and singular to whom these presents shall come, greeting :

" Whereas a treaty was made at the agency-house in the Caddo nation and State of Louisiana, on the 1st day of July, 1835, between the United States, by their commissioner, Jehiel Brooks, and the chiefs, head men, and warriors of the Caddo nation of Indians ; and whereas certain supplementary articles were added thereto, at the same time and place ; which treaty, and articles supplementary thereto, are in the words following, to wit : —

" Articles of a Treaty made at the Agency-House in the Caddo Nation and State of Louisiana, on the 1st day of July, in the year of our Lord 1835, between Jehiel Brooks, Commissioner on the part of the United States, and the Chiefs, Head Men, and Warriors of the Caddo Nation of Indians.

" Article 1st. The chiefs, head men, and warriors of the said nation agree to cede and relinquish to the United States all their land contained in the following boundaries, to wit :

" Bounded on the west by the north and south line which separates the said United States from the republic of Mexico, between the Sabine and Red Rivers, wheresoever the same shall be defined and acknowledged to be by the two governments ; on the north and east by the Red River, from the point where the said north and south boundary line shall intersect the Red River, whether it be in the Territory of Arkansas or the State of Louisiana, following the meanders of the said river down to the junction with the Pascagoula Bayou ; on the south by the said Pascagoula Bayou to its junction with the Bayou Pierre ; by said bayou to its junction with Bayou Wallace ; by said bayou and Lake Wallace to the mouth of the Cypress Bayou ; thence up said bayou to the point of its intersection with the first-mentioned north and south line, following the said watercourses ; but if the said Cypress Bayou be not clearly definable so far, then from a point which shall be defina-

ble by a line due west, till it intersects the said first-mentioned north and south boundary line, be the contents of land within said boundaries more or less.

" Article 2d. The said chiefs, head men, and warriors of the said nation do voluntarily relinquish their possession to the territory of land aforesaid, and promise to move, at their own expense, out of the boundaries of the United States, and the territories belonging and appertaining thereto, within the period of one year from and after the signing of this treaty, and never more return to live, settle, or establish themselves as a nation, tribe, or community of people within the same.

" Article 3d. In consideration of the aforesaid cession, relinquishment, and removal, it is agreed that the said United States shall pay to the said nation of Caddo Indians the sums in goods, horses, and money hereinafter mentioned, to wit: Thirty thousand dollars to be paid in goods and horses, as agreed upon, to be delivered on the signing of this treaty; ten thousand dollars in money, to be paid within one year from the 1st day of September next; ten thousand dollars per annum, in money, for the four years next following, so as to make the whole sum paid and payable eighty thousand dollars.

" Article 4th. It is further agreed, that the said Caddo nation of Indians shall have authority to appoint an agent or attorney in fact, resident within the United States, for the purpose of receiving for them, from the said United States, all of the annuities stated in this treaty, as the same shall become due; to be paid to their said agent or attorney in fact, at such place or places within the said United States as shall be agreed on between him and the proper officer of the government of the United States.

" Article 5th. This treaty, after the same shall have been ratified and confirmed by the President and Senate of the United States, shall be binding on the contracting parties.

" In testimony whereof the said Jehiel Brooks, commissioner as aforesaid, and the chiefs, head men, and warriors of the said nation of Indians, have hereunto set their hands and affixed their seals at the place, and on the day and year above written.

(Signed,)          J. BROOKS."

The chiefs, head men, and warriors who signed this treaty were twenty-five in number, and it purported to be executed in presence of

" T. J. HARRISON, Capt. 3d Regt. Inf. command'g detachment.
J. BONNELL, 1st Lieut. 3d Regt. U. S. Infantry.
G. P. FRILE, Brevet 2d Lieut. 3d Regt. U. S. Infantry.
38 *

D. M. HEARD, M. D., Acting Assistant Surgeon, U. S. A.
ISAAC C. WILLIAMSON.
HENRY QUEEN.
JOHN W. EDWARDS, Interpreter."

" Agreeably to the stipulations in the third article of the treaty, there have been purchased, at the request of the Caddo Indians, and delivered to them, goods and horses to the amount of thirty thousand dollars. As evidence of the purchase and delivery as aforesaid, under the direction of the commissioner, and that the whole of the same have been received by the said Indians, the said commissioner, Jehiel Brooks, and the undersigned, chiefs and head men of the whole Caddo nation of Indians, have set their hands and affixed their seals the third day of July, in the year of our Lord one thousand eight hundred and thirty-five.

(Signed,)                                          J. BROOKS.

Tarshar,          his ⋈ mark [seal].
Tsauninot,        his ⋈ m⋗  [seal].
Satiownhown,     his ⋈ ᴍark [seal].
Oat,              his ⋈ mark [seal].
Ossinse,          his ⋈ mark [seal].
Tiohtow,          his ⋈ mark [seal].
Chowawanow,      his ⋈ mark [seal].

" In presence of
LARKIN EDWARDS.
HENRY QUEEN.
JOHN W. EDWARDS, Interpreter.
JAMES FINNERTY.

*Supplement.*

" Articles supplementary to the Treaty made at the Agency-House, in the Caddo Nation and State of Louisiana, on the 1st day of July, 1835, between Jehiel Brooks, Commissioner on the part of the United States, and the Chiefs, Head Men, and Warriors of the Caddo Nation of Indians, concluded at the same place, and on the same day, between the said Commissioner on the part of the United States, and the Chiefs, Head Men, and Warriors of the said Nation of Indians, to wit : —

" Whereas the said nation of Indians did, in the year 1801, give to one François Grappe, and to his three sons then born and still living, named Jacques, Dominique, and Balthazar, for reasons stated at the time, and repeated in a memorial which the said nation addressed to the President of the United States in the month of January last, one league of land to each, in

accordance with the Spanish custom of granting land to individuals. That the chiefs and head men, with the knowledge and approbation of the whole Caddo people, did go with the said François Grappe, accompanied by a number of white men, who were invited by the said chiefs and head men to be present as witnesses, before the Spanish authority at Natchitoches, and then and there did declare their wishes touching the said donation of land to the said Grappe and his three sons, and did request the same to be written out in form, and ratified and confirmed by the proper authorities agreeably to law.

" And whereas Larkin Edwards has resided for many years, to the present time, in the Caddo nation, was a long time their true and faithful interpreter, and, though poor, he has never sent the red man away from his door hungry ; he is now old, and unable to support himself by manual labor, and, since his employment as their interpreter has ceased, possesses no adequate means by which to live : Now, therefore, —

" Article 1st. It is agreed, that the legal representatives of the said François Grappe, deceased, and his three sons, Jacques, Dominique, and Balthazar Grappe, shall have their right to the said four leagues of land reserved for them, and their heirs and assigns, for ever. The said lands to be taken out of the lands ceded to the United States by the said Caddo nation of Indians, as expressed in the treaty to which these articles are supplementary. And the said four leagues of land shall be laid off in one body in the southeast corner of their lands ceded as aforesaid, and bounded by the Red River four leagues, and by the Pascagoula Bayou one league, running back for quantity from each, so as to contain four square leagues of land, in conformity with the boundaries established and expressed in the original deed of gift made by the said Caddo nation of Indians to the said François Grappe and his three sons, Jacques, Dominique, and Balthazar Grappe.

" Article 2d. And it is further agreed, that there shall be reserved to Larkin Edwards, his heirs and assigns, for ever, one section of land ; to be reserved out of the lands ceded to the United States by the said nation of Indians, as expressed in the treaty to which this article is supplementary, in any past thereof not otherwise appropriated by the provisions contained in these supplementary articles.

" Article 3d. These supplementary articles, or either of them, after the same shall have been ratified and confirmed by the President and Senate of the United States, shall be binding on the contracting parties, otherwise to be void and of no effect upon the validity of the original treaty to which they are supplementary.

" In testimony whereof, the said Jehiel Brooks, commissioner as aforesaid, and the chiefs, head men, and warriors, of the said nation of Indians, have hereunto set their hands and affixed their seals, at the place and on the day and year above written.

J. BROOKS."

(Signed by the same chiefs and attested by the same witnesses.)

" Now, therefore, be it known that I, Andrew Jackson, President of the United States of America, having seen and considered the said treaty, do, by and with the advice and consent of the Senate, as expressed in their resolution of the 26th of January, 1836, accept, ratify, and confirm the same, and every clause and article thereof.

" In testimony whereof, I have caused the seal of the United States to be hereunto affixed, having signed the same with my hand.

" Done at the city of Washington, this 2d day of February, in the year 1836, and of the independence of the United [L. s.] States the sixtieth.

ANDREW JACKSON.

" By the President:
    JOHN FORSYTH, *Secretary of State.*"

At the ensuing session of Congress, memorials were presented by some of the persons who claimed land situated upon Rush Island, which was included within the boundaries of the above cession; and a correspondence was exhibited between Rice Garland, one of the members of Congress from Louisiana, and Lewis Cass, then Secretary of War. These circumstances are mentioned here, because they are referred to in the bills of exceptions. The memorialists alleged that Rush Island had never belonged to the Caddo Indians, and was fraudulently included in the treaty. On the 30th of December, 1836, a committee of the House of Representatives reported that the title to the reservation did not pass to the Grappes.

On the 18th of January, 1837, Jehiel Brooks, the commissioner, obtained deeds from the devisees of Grappe, he having devised all his property to his children, by a will duly executed and recorded. These deeds conveyed all the land included within the reservation.

On the 19th of September, 1837, the following memorial was presented to the Senate of the United States. It was signed by twenty-one chiefs, many of whom were parties to the treaty.

" *To the Honorable the Senate of the United States :* —

" The undersigned chiefs, head men, and warriors of the Caddo tribe of Indians would most respectfully represent unto your honorable body, that they have, this 19th day of September, 1837, heard the treaty read and interpreted to them by a white man who understands and speaks their language well, by which treaty, (concluded between Jehiel Brooks, the Indian agent, on the one part, and the chiefs, head men, and warriors of the Caddo Indians on the other part,) the said chiefs, head men, and warriors sold to the United States their land ; that they discover that the bounds and limits of the treaty are not such as they understood at the time of the treaty ; that they contain lands that the Indians never claimed, and never sold, which land the Indians believed belonged to the United States, or to the French or Spanish ; that the land sold by them to the United States is contained within the following bounds, to wit : Bounded on the west by the north and south line which separates the United States and Mexico, between the Sabine and Red Rivers, wheresoever the same shall be defined and acknowledged to be by the two governments ; on the north and east by the Red River, from the point where the said north and south boundary line shall intersect said Red River, following the western waters of said river down to where the Bayou Cypress empties into the same ; thence up Bayou Cypress, following the meanders of the stream, to the western boundary line ; that the said Indians never claimed any of the low lands between the Bayou Pierre (the western channel of Red River) and the main Red River, which is the eastern channel ; that they know that the land between the Bayou Pierre and the main channel of Red River has, for a long time, been exclusively settled and claimed by the white people ; that the Indians did not claim said land, and never requested the Indian agent to remove them ; and further, that they, the said chiefs, head men, and warriors of the said Caddo Indians, never made any reserve to any person in the treaty aforesaid, except to Mr. Larkin Edwards, an old white man that lived among them a long time ; that Mr. Brooks, the Indian agent, told them that they could give Larkin Edwards a small piece of land if they wished to do so ; that they then told Mr. Edwards that they would give him a small piece of land anywhere he wanted it in their lands. The said chiefs, head men, and warriors would further represent unto your honorable body, that Jehiel Brooks told one of the chiefs that one Jacques Grappe requested him to ask the Indians for a piece of land on Red River, in the bottom and on the east side of the Bayou Pierre (the western water of Red River) ; that the said chief told Mr. Brooks that

it was not their land, and Mr. Brooks told him that it was their land. The chief then told Mr. Brooks that, if it was their land, he was willing to give Jacques Grappe a little piece; but that they never made any reserve to François Grappe, or any of his heirs or representatives, by the treaty, within the limits of land they claimed or sold to the United States.

"In witness of the truth of the above statement the said chiefs, head men, and warriors have hereunto set their hands, the day of the date above."

On the 22d of May, 1838, a committee of the Senate reported that Rush Island never belonged to the Caddo Indians, and recommended a confirmation of the titles of certain settlers who were living on it anterior to the treaty between the United States and Caddoes.

In 1840, memorials were again presented to Congress by these last-mentioned settlers, and much testimony was taken by the authority of Mr. Bell, chairman of the committee to whom the memorials were referred.

In April, 1842, a committee of the House of Representatives reported in favor of confirming the titles of these settlers, and on the 6th of July, 1842, an act of Congress was passed confirming them. (5 Stat. at Large, 491.)

On the 30th of August, 1842, the joint resolution was passed which is set forth in the commencement of this statement.

On the 24th of February, 1846, S. W. Downs, the District Attorney of the United States, filed a petition in the Circuit Court of the United States for the District of Louisiana against the parties named in this report, alleging that they had unlawfully and fraudulently taken possession of the land therein described. The claim of the United States is thus set forth in the petition : —

"Petitioners allege, that they are the true and lawful owners of the above-described land and premises, and that the pretended claim of the said possessors is illegal, invalid, and fraudulent; that by the treaty of cession of the province of Louisiana by the French Republic to the United States of America, and by the treaty between Spain and the United States of America in 1819, the United States succeeded to all the rights of France and Spain, as they then were in and over said province, including all lands which were not private property, and that the aforesaid tract of land, ever since the said treaties, remained vested in the said plaintiffs, who are now the true and legal owners of the same; that plaintiffs have suffered damage to the amount of twenty thousand dollars, by the disturbance and occupation of said land by said possessors."

On the 18th of March, 1846, Brooks answered the petition.

He set forth the treaty, its ratification and proclamation; alleged that the heirs of Grappe acquired a perfect title under the reservation which he had since purchased, and that under the joint resolution of Congress the District Attorney of the United States was not authorized to allege fraud against him as commissioner; that he had sold and delivered sundry parts of the land to other persons, who were also defendants.

On the 13th of April, 1846, the District Attorney of the United States filed the following notice to the defendants of certain evidence which he proposed to offer upon the trial of the cause.

" UNITED STATES v. JEHIEL BROOKS ET AL.

" The defendants in the above-entitled cause will take notice that the plaintiffs will offer, as evidence on the trial of this cause, so much of Report 1035 of the House of Representatives of the United States of the 27th Congress, second session, as is hereafter mentioned, to wit: The various reports of the committees embraced in this report, and the following depositions, that of Lewis Naville Rembin, Charles Rembin, Thomas Wallace, Jacob Irwin, Joseph Valentine, Sylvester Poïssot, Cesair Lafitee, John Joseph Le Bars, Michel Lattier, Francis Lattier, Pierre Rublo, Manuel Lafitte, D. M. Heard, Athanase Poissot, and all the depositions which were taken on the part of the United States embraced in this report aforesaid; also, plaintiffs will offer in evidence the same depositions, embraced in a similar report and admitted by consent of parties in a suit between Jehiel Brooks v. Samuel Norris, in the District Court of the parish of Caddo, in said State, said Norris holding title under the United States, on Rush Island, in which the same issues were made as in this suit, and said Brooks, plaintiff in that suit and defendant in this.  Defendants are hereby notified to make objection, if any they have, on Friday the 17th instant, why the testimony aforesaid should not be admitted on the trial of this cause; said reports and depositions are herewith filed for reference," &c.

On the 28th of April, 1846, the court overruled so much of the above motion as proposed to introduce, as evidence, the report made by a committee of Congress, and disposed of the remaining part of the motion, viz. that part of it which proposed to introduce certain testimony, by the following order, applicable to that part of the motion : —

" UNITED STATES v. JEHIEL BROOKS.

" *United States Circuit Court, District of Louisiana.*

" Be it remembered, that on the 13th of April, 1846, a rule

was taken in this cause by the plaintiffs, calling on the defend-ants to show cause on the 17th of the same month why the depositions of certain witnesses named in said rule, and taken as therein stated, should not be read in evidence in this cause, when the same shall come on to be tried, as appears in said rule, which is hereunto annexed, and made a part of this bill of exceptions; and on the said 17th of April, 1846, Jehiel Brooks, by his counsel, Thomas H. Lewis, appeared and showed cause against the said rule, and contended that the said rule ought to be dismissed and discharged on the follow-ing grounds:—

"1st. The court cannot entertain this rule at the present stage of the suit, because the only law authorizing such a rule is an act of the legislature of the State of Louisiana, entitled 'An Act to amend the Code of Practice,' approved March 20, 1839, (see Acts 1839, page 168, section 17,) and said act does not apply to the present case, but is only applicable to deposi-tions taken under commissions issued by the court, and in the suit in which such depositions are offered as evidence.

"2d. The court cannot be called upon to decide upon the admissibility of any evidence in a cause before the same shall come on for trial, except in the case pointed out in said act of 20th March, 1839, and these depositions do not fall within the exception provided for by that act.

"3d. These depositions were not taken in any action or suit pending before any judicial tribunal, or by authority of any tri-bunal having power to decide upon title to property, or to bind parties litigant by its decisions.

"4th. There is no evidence before the court of any such suit as that of Jehiel Brooks *v.* Samuel Norris, or that these depo-sitions were read in evidence, by consent or otherwise, on the trial of such suit, and these facts are not admitted.

"5th. If such a suit as Brooks *v.* Norris did exist, and if said depositions were read in evidence on the trial thereof, still they are not admissible in this cause, because the parties to this suit are not the same as the parties to that of Brooks *v.* Norris.

"Which grounds of objection being sustained by the court, the counsel for plaintiffs tendered this bill of exceptions, which was signed and sealed.

(Signed,)          Theo. H. McCaleb, *U. S. Judge.*"

On the 7th of April, 1847, the District Attorney of the Unit-ed States (Thomas J. Durant) filed a petition that the case might be tried by a jury.

In the early part of the year 1848, the defendants, other than Brooks, named in statement, filed their answers, averring that

they were *bonâ fide* purchasers for a valuable consideration, without notice of any fraud.

On the 2d of May, 1848, the cause came on to be heard, and a jury was impanelled, who, on the 5th of May, found a verdict for the defendants, and judgment was entered accordingly.

The four following bills of exceptions were taken during the progress of the trial: —

" No. 1.

" THE UNITED STATES *v.* JEHIEL BROOKS ET AL.

" In the Circuit Court of the United States for the Fifth Circuit and District of Louisiana, Honorable T. H. McCaleb, Judge of the District Court, alone presiding; April term, 1848.

" Be it remembered, that on the trial of this cause, on the 3d day of May, 1848, the attorney of the United States offered to read in evidence before the jury a letter from Lewis Cass, Secretary of War, to Rice Garland, Representative in Congress from Louisiana, dated 17th March, 1836, a copy of which is hereunto annexed.

" The counsel for defendants objected to the reading of said letter, which objection was sustained by the court; whereupon the attorney of the United States tenders this his bill of exceptions, praying that the same may be signed and made part of the record in this case.

(Signed,)        THEO. H. McCALEB, *U. S. Judge.*"

" No. 2.

" THE UNITED STATES *v.* JEHIEL BROOKS ET AL.

" In the Circuit Court of the United States for the Fifth Circuit and District of Louisiana, Honorable T. H. McCaleb, Judge of the District Court, alone presiding; April term, 1848.

" Be it remembered, that on the trial of this cause, on the 4th day of May, 1848, the counsel of defendants offered to read in evidence before the jury copies of affidavits of David, Trichel, and D'Ortlont, made *ex parte* in Louisiana, and attached to a copy of a memorial of Pelagie Grappe and others to the Senate of the United States, and contained in a certified copy of the proceedings of said Senate of 12th January, 1836, the attorney of the United States objected to the reading of said affidavits, but the court overruled his objections, and allowed them to be read, merely to prove the fact that such affidavits had been submitted to the Senate of the United States, but not as evidence of the contents of said affidavits, and the

jury were so especially instructed by the court; whereupon the attorney of the United States tendered this as his bill of exceptions, praying that the same may be signed and made part of the record.

(Signed,) THEO. H. MCCALEB, *U. S. Judge.*"

" No. 3.

" THE UNITED STATES *v.* JEHIEL BROOKS ET AL.

" In the Circuit Court of the United States for the Fifth Circuit and District of Louisiana, Hon. T. H. McCaleb alone presiding; April term, 1848.

" Be it remembered, that on the trial of this case, on the 4th day of May, 1848, the attorney of the United States offered to read in evidence before the jury a memorial dated on the 19th of September, 1837, to the Senate of the United States, from the Caddo tribe of Indians, a copy of which is hereunto annexed.

" The counsel of defendants objected to the reading of said memorial, which objection was sustained by the court; whereupon the attorney of the United States tenders this his bill of exceptions, praying that the same may be signed and made part of the record in this case.

(Signed,) THEO. H. MCCALEB, *U. S. Judge.*"

No. 4.

" THE UNITED STATES *v.* JEHIEL BROOKS ET AL.

" In the Circuit Court of the United States for the Fifth Circuit and District of Louisiana, Hon. T. H. McCaleb, Judge of the District Court, alone presiding; April term, 1848.

" Be it remembered, that on the trial of this case, on the 5th day of May, 1848, after the arguments of counsel on both sides had been closed, and before the jury had retired to consider on their verdict, the attorney of the United States prayed the court to charge the jury as follows, to wit:—

" First. That the first of the supplementary articles to the treaty between the United States and the Caddo Indians, made at the agency-house of the Caddo nation on the 1st of July, 1835, does not amount in law to a grant of four leagues of land from the United States to François Grappe and his sons, nor does it amount in law to a reservation then made of said lands to the said Grappes, but it is simply a reservation of whatever right the said Grappes may have acquired to said land by the donation mentioned in the preamble to the supplementary articles to the said treaty.

" Second. That the recital in the said preamble and supplementary articles, of a donation to the Grappes in 1801, does

not relieve the defendants from the necessity of producing the primordial title or donation of 1801, nor does said recital prove the existence of said donation.

" Third. That by the laws of Spain, which governed the *locus in quo* in 1801, the Indians had no primitive title to any land on this continent; and that in 1801 the Spanish authority at Natchitoches had no legal right to ratify and confirm the donation recited in the aforesaid preamble and supplementary articles.

" Fourth. That, by the laws and usages of the government of the United States, the Caddo Indians did not hold their land by the usual Indian title, but that they had been merely permitted to live upon it.

" Fifth. That the legal construction of the Caddo treaty of the 1st of July, 1838, is, that those Indians merely relinquished to the United States their permissive possession of the lands.

" Sixth. That, as all the other defendants, besides Brooks, are his vendees, and hold title under him, if the jury think from the evidence that Brooks has no title to the land, then that the other defendants stand in the same category, and are also without title.

" But the court refused so to charge the jury, and did charge them as follows : —

" First. That the treaty between the United States and the Caddo Indians on the 1st of July, 1835, and the articles supplementary thereto, having been ratified by the President and Senate of the United States, is part of the supreme law of the land, and as such must be respected and enforced by the courts of the United States.

" Second. That the first supplementary article to the said treaty, and the preamble thereof, contain a recognition of title in François Grappe and his three sons to the land described in said preamble and article, and dispensed them, and those who hold under them, from producing any other title to said lands.

" Third. That the United States, by treating with the Caddo Indians for the purchase of their lands, recognized in said Indians a right to said lands, similar to the rights to lands generally recognized in Indian tribes with whom the United States have made treaties.

Fourth. That the testimony offered on behalf of the United States, to prove the lands reserved by the treaty in question to the Grappes had been fraudulently included within the limits of the territory ceded to the United States by the Caddo Indians, by the defendant, Jehiel Brooks, while acting as commissioner of the United States in making said treaty, was

properly admitted to be read to the jury, and they should consider the same ; and if they found said Brooks guilty of fraud, they should find a verdict for plaintiffs against said Brooks.

" Fifth. That the other defendants stood in a different light before the court from Brooks, and the jury should inquire (if they found fraud in Brooks) whether said defendants had notice or knowledge of such fraud when they purchased the land held by them ; and if the jury believed, from the evidence, that these other defendants (purchasers from Brooks) had notice or knowledge of such fraud, they should find also against them. But if, on the contrary, these purchasers had no such knowledge or notice, then the fraud in Brooks, their vendor, would not affect their title.

" Whereupon the attorney of the United States for the District of Louisiana excepted to the said refusal and charge, and tenders this as his bill of exceptions, which he prays may be signed and made part of the record.

   (Signed,)         Theo. H. McCaleb, *U. S. Judge.*"

A writ of error, sued out on behalf of the United States, brought these several rulings before this court.

Such is the history of this transaction before and since it was brought into court by the United States.

All of us concur in opinion, that no exception was taken by the counsel of the United States to the rulings of the District Court in this cause, which can be sustained here.

We think that the treaty gave to the Grappes a fee simple title to all the rights which the Caddoes had in these lands, as fully as any patent from the government could make one. The reservation to the Grappes, " their heirs and assigns for ever," creates as absolute a fee as any subsequent act upon the part of the United States could make. Nothing further was contemplated by the treaty to perfect the title.

Brooks being the alienee of the Grappes for the entire reservation, he may hold it against any claim of the United States, as his alienors would have done.

We have nothing to do, in our consideration of the case, with the conjectural intimations, which were made in the argument of it, concerning the influences which were used to secure the reservation, or the designs of the commissioner in having it done. The record shows that he became a purchaser for a valuable consideration. Whether for an adequate one is not for us to say. His right to the land against the claim of the United States, as that has been asserted in this case, we think good, and we shall direct the judgment of the court below to be affirmed.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Louisiana, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, affirmed.