Welles, J.
 

 {Dissenting)
 
 — The first point made on behalf of the appellants, is, that the plaintiff in the court below could not maintain an action, individually, for trespass on land belonging to the Seneca Nation of Indians; the bill of exceptions shows that the plaintiff is a native Indian, belonging to the Tonawanda band of the Seneca Nation; that the close mentioned in the second count of the declaration is situated in the town of Pembroke, in the county of Genesee, upon the tract of 12,800 acres, commonly known and designated by the name of the Tonawanda reservation; that the close in question is, and was at the time of the entry complained of, and at the time of the commencement of the suit, an Indian improvement upon said Tonawanda reservation ; that the said improvement was made, about twenty years before the trial, by the plaintiff and seven other Tonawanda Indians; that the plaintiff has resided on the Tonawanda reservation, with the same band, from his birth; that he was in the actual possession of said improvement, at the time of the entry complained of; that on the 13th day of July 1846, the defendants entered into and took possession of the said close, and turned the plaintiff out, and in doing this, committed an assault upon him.
 

 I am not aware of any legal impediment in the way of the plaintiff’s sustaining the action, under such a state of facts; he was in possession of the close, and for the purposes of this *question, his possession is to be ^ deemed rightful, and the defendants had no right ■- to disturb him. The fact that he was an Indian, it seems to me, should not disqualify him from seeking redress in our courts, in the ordinary way, for such an injury. We
 
 *419
 
 are not informed by the case, what were the particular relations of the individuals of his tribe or nation with each other, respecting the rights of property, in regard either to real or personal estate; whether they held all things in common, or whether the title or right of property in respect to each other was in the individuals or the nation, or in the particular tribes or bands. It seems to me, it would not do, to hold an individual of the nation ipcapable of sustaining an action for an injury to his person or his personal property, committed by a citizen of our government; and it will be difficult, upon principle, I apprehend, to distinguish between such a case -and that of an intrusion without right upon his possession of land.
 

 The general rule is, that the person in possession must bring the action "for trespass on land; and it appearing that the plaintiff was in the actual possession of the close in question, at the time of the injury complained of, it seems to me, it was competent for him to commence and sustain the action. Provision is made in § 8 of the act entitled'“An act in relation to certain tribes of Indians,” passed 25th May 1841 (c. 234), by which actions for trespasses on Indian lands may be brought in the name of the people of this state, or by any three chiefs of the tribe. But this does not, as I think, deprive an individual Indian of his common-law right to sustain an action for a like injury. The act, I suppose, was designed to furnish additional facilities for preventing such trespasses, and additional protection to the Indians. The foregoing remarks are designed, of course, to apply to the case as the facts appeared at the trial, when the plaintiff rested, and befo] e the evidence of the title of the defendant Fellows had been introduced.
 

 But it is further contended on behalf of the defendants, that the defendant Fellows had the legal title in
 
 *420
 
 fee in the premises, *and, therefore, / had the ^ right to enter upon and take possession of them ^ and to oust the plaintiff therefrom. The second plea of the defendants sets up this defence on the part of the defendant Fellows, and that the defendant Kendle, at the time, when, &c., acted as the servant of Fellows, and by his command, &c. The replication simply takes issue upon the title of Fellows. If that issue was maintained by the proof, the justice before whom the action was tried, erred in fuling the contrary, and the judgment in the court below should be reversed.
 

 At the close of the evidence, the plaintiff’s counsel objected to the proof of title in Fellows, claiming -that such proof was defective in twelve particulars, which were specified. The circuit court decided and ruled, generally, without passing upon the objections separately, that the defendants had failed to establish any right or title to the close in question in the defendant Fellows.
 

 The defendant Fellows claimed title to the premises, by purchase from the Seneca Nation of Indians; to sustain which, he gave in evidence, among other things, an indenture purporting to have been made and concluded between Thomas Ludlow Ogden and Joseph Fellows, of the one part, and the chiefs and headmen of the Seneca Nation of Indians, of the other part, at a council duly assembled and held at Buffalo creek, in the state of New York, on the twentieth day of May 1842, by which the said chiefs and headmen did, among other things, grant, release and confirm unto the said Ogden and Fellows, their heirs and assigns, in joint-tenancy, the two tracts of land severally called- the Buffalo Creek reservation and the Tonawanda reservation, and all the right and interest therein of the said nation. For which Ogden and Fellows were to pay to the nation a just consideration to be estimated and ascertained as follows: Assuming the value of the said two reservations, together with the Cattaraugus ¿and Allegeny reservations (for the purchase of all four of which tracts or reservations by Ogden and Fellows from the nation a previous agreement had been made), to be deemed and taken to be $202,000, of * 421 1 w^ck sum $100,000 *should be deemed to be the 1 value of such title in and to all the lands within the foui tracts, exclusive of improvements thereon, and 102,000 to be the value of the improvements within the said four tracts; and of the said sum of $100,000, Ogden and Fellows were to pay to the Seneca Nation such proportion as the value of all the lands within the Buffalo Creek and Tonawanda reservations should bear to the value of all the lands within the four tracts; and of the $102,000 they should, pay such proportion as the value of. the improvements on the two tracts should bear to the value of. the improvements on all the four tracts. Such consideration to be determined by the judgment and award of arbitrators, one to be named by the secretary of war and one by Ogden and Fellows, which arbitrators might employ suitable surveyors to explore, examine and report on the lands and improvements, and to ascertain the contents of each of the said tracts. The indenture also provided that the same arbitrators should also award and determine the amount to be paid to each individual Indian, out of the sum which, on the principles above stated, they should ascertain and award to be the proportionate value of the improvements on the Buffalo Creek and Tonawanda reservations, with provision for choosing an umpire, in case of disagreement between the arbitrators. The arbitrators were to make a report in writing of their proceedings, in duplicate, one to be filed in the office of the secretary of war, and the other to be delivered to Ogden and Fellows.
 

 The fifth article of this indenture is in the words following: “ Article 5th. It is agreed, that the possession of the two tracts hereby confirmed to the said Ogden and Fellows shall be surrendered and delivered up to
 
 *421
 
 them as follows, viz: The forest or unimproved lands on the said tracts, within one month after the report of the said arbitrators shall be filed in the office of the department of war, and the improved lands, within two years after the said report shall have been so filed; provided, always, that the said amount to be so ascertained and awarded, as the proportionate value of the said improvements, shall, on the surrender thereof, be paid to the president of the United States, to be distributed among the ^owners of the said improvements, according ^ # ^ to the determination and award of the said *- arbitrators in this behalf; and provided further, that the consideration for the release and conveyance of the said lands shall, at the time of the surrender thereof, be paid or secured, to the satisfaction of the said secretary of the war department, the income of which is to be paid to the said Seneca Nation of Indians, annually. But any Indian having improvements may surrender the same, and the land occupied by him and his family, at any time prior to the expiration of the said two years, upon the amount awarded to him for such improvement being paid to the president of the United States, or any agent designated by him for that purpose, by the said Ogden and Fellows, which amount shall be paid over to the Indian entitled to the same, under the direction of the war department.” The indenture contained various other articles and provisions, none of which are necessary to be stated in the present connection.
 

 On the same day on which the indenture was made and bears date, at the same place, a treaty was made and concluded between the United States, by Ambrose Spencer, their commissioner thereto duly authorized, on the one part, and the chiefs, headmen and warriors of the Seneca Nation of Indians, duly assembled in council, on the other part'; reciting among other things, the said indenture
 
 verbatim,
 
 and consenting to the several articles and stipulations contained therein between the sai'd
 
 *422
 
 nation and the said Ogden and Fellows, and providing that the United States would receive and pay the sum stipulated to be paid as the consideration-money of the improvements specified in the indenture, and would receive, hold and apply the sum to be paid or the securities to be given for the lands therein mentioned, as provided for in such indenture.
 

 In pursuance of this treaty, and of the indenture incorporated therein, Thomas C. Love was appointed by the secretary of war, and Ira Cook, by Ogden and Fellows, arbitrators to discharge the duties in the indenture specified. On the first of April 1844, their report and * 423 1 awarc*' premises, bearing *date 26th March 1844, was received and filed in the office of the war department, by which report and award it appears, that they had agreed upon all the matters in and by the said indenture submitted to them. That they had determined, adjudged and awarded that Ogden and Fellows should pay to the Seneca Nation the sum of $75,000 for the Indian title to all the lands in the Buffalo Greek and Tonawanda reservations, and that they should pay the said nation $58,708.96, as the value of the improvements on the two last-mentioned reservations. They also determined the amount to be paid to each individual Indian on the Buffalo Creek reservation for his improvement. The report of the arbitrators, as well as the oral evidence given on the trial, shows that they, the said arbitrators, attempted to go upon the Tonawanda reservation, with surveyors and other assistants, for the purpose of making the necessary surveys and examinations in order to determine the amount to be paid to each individual Indian, in pursuance of said treaty and indenture, and that they actually went upon the said reservation for that purpose, and were about commencing their work, when a large number and nearly all of the adult Indians residing thereon being assembled, and among them the plaintiff, the arbitrators
 
 *423
 
 were forbidden by the plaintiff and others, and prevented from proceeding in such work, and were ordered to leave the reservation, and the arbitrators were each taken by the arm by the plaintiff, and led off beyond the line of the reservation, and that such acts of the plaintiff and others of such Indians, in preventing the arbitrators from the performance of their duties in this respect, were in pursuance of a unanimous resolve of all the Indians so assembled.
 

 The case shows, that Ogden and Fellows have duly paid the whole of all the moneys awarded by the arbitrators to be paid by them for the title and improvements of both the Buffalo Creek and Tonawanda reservations. It was admitted on the trial, that Thomas L. Ogden died in December 1844, which was previous to the alleged trespass. As the grant in the indenture was to Ogden and Fellows *as joint-tenants, whatever title they derived thereby, upon the death of *- Ogden, survived to Fellows.
 

 The supreme, court, at general term, refused a new trial, holding that the determination and award of the arbitrators of the amount due to each individual Indian, in pursuance of the provisions of the indenture, was a condition precedent to the vesting of the title in Ogden and Fellows, who accepted the grant subject to that condition, and undertook the risk of its performance; and that inasmuch as it had never been performed, their title had not vested.
 

 I am inclined to the opinion, that the provision in the indenture, for the appraisement of the value of the improvements of each individual Indian, is not to be regarded as a condition of the grant. By the second article of the indenture, the chiefs and headmen of the nation, “do grant, lease and confirm unto the said Thomas Ludlow Ogden and Joseph Fellows, and to their heirs and assigns, in joint-tenancy, the whole of the said two tracts of land, severally called the Buffalo Creek
 
 *424
 
 reservation and the Tonawanda reservation, and all the right and interest therein of the said nation.” The words
 
 “release, grant and confirm,”
 
 are effective to pass the title, and sufficient for that purpose; they amount to a conveyance
 
 in 'prsesenti.
 
 The consideration for the grant is stated to be certain facts recited therein, the agreement of Ogden and Fellows mentioned in the first article, and the agreement next thereinafter contained, which is for the payment by Ogden and Fellows of the purchase-money, the amount to be determined by the arbitrators as before stated. The payment of the purchase-money, in an instrument containing terms equivalent to a grant of the lands, in order to amount to a condition of the grant, must be so provided, showing that to have been the intention of the contracting parties.
 

 In the present case, it is provided in the fifth article of the indenture, and, as I think, as a condition of the grant, that the gross amount to be ascertained and awarded as the proportionate value of the improvements, should, on the surrender of the lands, be paid by * 425 1 and Fellows to *the president of the -* United States, who was to distribute the same among the individuals entitled thereto, according to the determination of the arbitrators; and also that the consideration for the release and conveyance of the lands should, at the same time, be paid or secured to be paid, to the satisfaction of the secretary of war, the income of which was to be paid to the said nation annually. These conditions have been complied with by the purchasers. Ogden and Fellows had no interest whatever in the proportion of the improvement-m oney to which any individual Indian should be entitled. The arbitrators were to determine the gross amount of the improvement-money, and that was all which Ogden and Fellows were .interested in knowing. This the arbitrators did, and upon the payment of the amount, together with the other part of the purchase-money by Ogden and Fel
 
 *425
 
 lows, their title and their right to possession of the forest or unimproved lands became complete, in one month after the filing of the report of the arbitrators, and to the improved lands, in two years. The question of the distribution of the money among the individual Indians, was. between them and the United States government, in which, as before remarked, Ogden and Fellows had no interest, and in reference to which, they had no duty to perform, except the payment of the money to the president of the United States. That could be done, when the gross amount of the value of all the improvements was ascertained and not before.
 

 The ascertainment by the arbitrators of the amount to be paid for the title and improvements,, naturally, if not necessarily, preceded the division among the individuals of the tribe, of the improvement-money, which Ogden and Fellows could neither hasten or retard; and they were not bound to wait for it to be done, before paying their money and perfecting their title. For aught that appears, the division may yet be made by the same arbitrators, and there is no reason for doubting their readiness to perform that part of the duty referred to them, whenever those most interested in having it done will consent. If the plaintiff and his brethren of the Tonawanda band have not received the pay for their improvements, it is, most probably, attributable to their own *folly. The plaintiff appears to have been among the foremost in preventing the arbitrators from completing their work, and from doing that part of it which he now complains has not been done. Beyond a doubt, he should be held estopped from alleging, as a defect in his adversary’s title, an omission which he has deliberately contributed [*426 m procuring.
 

 Other objections are now made to the title of Ogden and Fellows. It is contended, that there was no evidence upon the trial, to show that the individuals assum
 
 *426
 
 ing to act as chiefs and headmen of the Seneca Nation were, in fact, authorized by the individuals of the nation to execute the indenture. It is sufficient to say, that the indenture was incorporated into and formed a part of the treaty of 1842; it was made at the same council of chiefs and headmen, at which the treaty was made; it was, in fact, the basis of the treaty. The individuals representing the nation at that treaty were then, and have been since repeatedly accredited and recognised by the United States government, as the ambassadors and agents of the nation for all the purposes of the treaty. When the treaty-making power of one government has accredited the envoy of another, and treated with, him as such, it is a fundamental principle, that the courts of the former cannot inquire into the authority of the envoy; the treaty is conclusive as to the authority of the persons assuming to represent the nation. The question of authority is one for the political department of the government to decide, and being so decided, the judicial department cannot review the decision.
 

 The Indian tribes and nations within the bounds of the different states and territories of the United States have been regarded and treated by the general government as distinct nations, and treaties have, in numerous instances, been held with them as such, arid treaties thus made have always been considered as solemn and binding upon the government and its citizens, as treaties with other governments, or as acts of congress. A number of treaties-have been made by the United States with this same Seneca Nation, at all of which they have *been regarded as a government of chiefs and ' headmen, and have been invariably represented in such treaties by such chiefs and headmen, or by chiefs, headmen and warriors, or by chiefs and warriors.
 

 I forbear any further notice of the objections raised upon the argument against the validity of the title of
 
 *427
 
 Ogden and Fellows, as it seems to me, they are all sufficiently answered in the several views already presented. I have regarded the one discussed by the supreme court, and upon which they held that title defective, to be the most important, and have confined myself mainly to its examination. I think, for the reasons mentioned, that the decision of the supreme court was erroneous, and that the judgment should be reversed, and a new trial granted, with costs to abide the event.
 

 Per Curiam.
 

 Resolved: 1. That the plaintiff, as an individual Indian, had the right of possession, and was in the lawful occupancy of the
 
 locus in quo,
 
 at the time of the alleged trespass. That this, right of occupancy was recognised by the fourth, fifth and seventh articles of the treaty of the 20th May 1842, mentioned in the bill of exceptions in this cause, and under which the defendants claim title.
 

 2. That by the true construction of that treaty, the plaintiff could not be lawfully ejected from or deprived of the possession of the lands occupied by him, for the time and in the manner stated in the bill of exceptions, by the defendants, until the amount he was entitled to réeeive for his improvements “as an individual Indian,” should be determined by “the judgment and award of arbitrators, one of whom should be named by the secretary of the war department of the United States, and one by Ogden and the defendant Fellows,” in pursuance of the fourth article of said treaty.
 

 *3. That, consequently, the making of such determination and award, and the filing of the *- same in the department of the secretary of war, in the manner prescribed by the fourth article of the treaty, was a condition precedent to a right of entry upon the part of the defendant Fellows, as survivor of T. L.
 
 *428
 
 Ogden, upon the
 
 locus in quo
 
 in the possession of the plaintiff.
 

 4. That the acts of the plaintiff and others of the Tonawanda band of Indians, in resisting the entry of the arbitrators upon their reservation, for the purpose of appraising the value of their improvements in their possession, respectively, did not excuse Ogden and Fellows from a compliance with the condition precedent aforesaid: 1st, because said Indians, as individuals, were not parties to the compact and treaty aforesaid; and, 2d, because it was not shown by the evidence in the case, that an appraisal and award could not have been made by the arbitrators, without such entry.
 

 Judgment affirmed
 

 The plaintiff, John Blacksmith, died, after the rendition of the judgment, and a writ of error was sued out by the defendant, Fellows, who survived Robert Kendle, directed to the personal representatives of the original plaintiff, from the Supreme Court of the United States ; where, after argument by Messrs.
 
 Qillet
 
 and
 
 Brown,
 
 for the plaintiff in error, and by Mr.
 
 Martindale,
 
 for the defendant in error, the following opinion was delivered by-
 

 Nelson, J.
 

 (after stating the facts of the case.) — It will be seen, that the principal change under the second treaty consists in the release, by Ogden and Fellows, to the Indians, of two of the four reservations conveyed to them under the treaty of 1838, and the corresponding reduction of the price to be paid. Most of the other provisions of the treaty are untouched and remained in force; the assignment by the government of the large tracts of country for the New York Indians; the special tract therein assigned to this Seneca Nation; their agreement to remove to their new homes, and the large
 
 *428a
 
 appropriation to aid in their removal, and in their support and encouragement, after they had arrived; all these provisions remained unaffected by the second treaty.
 

 Neither treaty made any"provision as to the mode or manner in which the removal of the Indians, or surrender of the reservations, was to take place. The grantees have assumed, that they were authorized to take forcible possession of the two reservations, or of the four, as the case would have been under the first treaty. The plaintiff, in this case, was expelled by force; and unless this mode of removal can be sustained, the recovery against the defendants for the trespass was right, and must be affirmed.
 

 The removal of tribes and nations of Indians from their ancient possessions to their new homes in the West, under treaties made with them by the United States, have been, according to the usage and practice of the government, by its authority, and under its care and superintendence. And, indeed, it is difficult to see how any other mode of a forcible removal can be consistent with the peace of the country, or with the duty of the government to these dependent people, who have been influenced by its counsel and authority to change their habitations.
 

 The negotiations with them, as a
 
 quasi
 
 nation, possessing some of the attributes of an independent people, and to be dealt with accordingly, would seem to lead to the conclusion, unless otherwise expressly stipulated, that the treaty was to be carried into execution by authority or power of the government which was a party to it; and more especially, when made with a tribe of Indians who are in a state of pupilage, and hold the relation to the government of a ward to his guardian. It is difficult to believe, that it could have been intended by the government, that those people were to be left, after they had parted with their title to their
 
 *428b
 
 homes, to be expelled by the irregular force and violence of the individuals who had acquired it, or through the intervention of the courts of justice. As we have seen, the Seneca Nation upon the four reservations consisted of a population of some 2633 souls; and, if we include the Tuscaroras, whose lands were also purchased, under the same treaty, nearly 3000. It is obvious, that such litigation would be appalling.
 

 If we look into the provisions of the two treaties, we think the conclusion as clear, from a consideration of them, that no such means or manner of removal was contemplated, as that derived from a consideration of their unfitness and impropriety, under the circumstances stated.
 

 The treaty of 1838 contemplated a removal to the tract west of the state of Missouri, and putting the Indians in possession of it. A large fund was appropriated, and in the hands of the government, to be disbursed in aid of such removal, and of their support and encouragement, after their arrival. It did not, therefore, separate these Indians from the care and protection of the government, on its ratification, but contemplated further duties towards them, and for which means were supplied. Besides, the purchase-money for the reservations was to be paid to the government; and, by the express terms of the treaty of 1842, the appraised value of the improvements was, on the surrender of the possessions, to be paid to the president of the United States, to be distributed among the owners of the improvements, according to the award of the appraisers. This provision shows, that the government was to be present at the surrender and payment for the improvements.
 

 The clause in the treaty of 1838 is still more specific, which was, that the improvements were “ to be paid by the United States to the individuals who were entitled to the same,” &c., “ on their relinquishing their respective possessions to the said Ogden and Fellows.” It is
 
 *428c
 
 also worthy of remark, that the St. Regis Indians, one of the nine tribes of the New York Indians, in giving their assent to the treaty of 1838, deemed it necessary to guard against a forcible removal to the west, by a clause providing that they “shall not be compelled to remove, under the treaty;” a removal to the west being in contemplation.
 

 We think, therefore, that the grantees derived no power, under the treaty, to dispossess by force these Indians, nor right of entry, so as to sustain an ejectment in a court of law; that no private remedy of this nature was contemplated by the treaty, and that a forcible removal must be made, if made at all, under the direction of the United States; that this interpretation is in accordance with the usages and practice of the government, in providing for the removal of Indian tribes from their ancient possessions; with the fitness and propriety of the thing itself; and with the fair import of the language of the several treaties bearing upon the subject.
 

 An objection was taken, on the argument, to the validity of the treaty, on the ground, that the Tonawanda band of the Seneca Indians were not represented by the chiefs and headmen of the band in the negotiations, and execution of it. But the answer to this is, that the treaty, after being executed and ratified by the proper authorities of the government, becomes the supreme law of the land, and the courts can no more go behind it, for the purpose of annulling its effect and operations, than they can behind an act of congress. (1 Cranch 103; 1 Pet. 735; 10 How. 442; 2 Pet. 307, 309, 314; 3 Story Const. Law, p. 695.)
 

 The view we have taken of the case, makes it unnecessary to examine the ground upon which the learned court below placed their decision; that court held the appraisal of the improvements, and payment therefor, were conditions precedent to the surrender of them by
 
 *428d
 
 the Indians; and that the refusal of the Tonawanda band to permit the appraisal did not excuse the performance of these conditions.
 
 The ground upon which we have placed our judgment, is not ■ in conflict with this view.
 
 We hold, that -the performance was not a duty that belonged to the grantees, but for the government, under the treaty. We think, the judgment of the court below was right, and should be affirmed.
 

 Judgment affirmed.
 
 [2]
 

 [2]
 

 It was subsequently decided by the supreme court of the United States, that the state had no right to tax these lands, whilst in the possession of the Indians, and before the expiration of the time fixed for their removal by the treaty; and that a sale for taxes, subject to-the Indian right of occupancy, was void, though it only operated upon the pre-exemption right of Ogden and Fellows. Fellows v. Denniston, 5 Wall. 761 ; reversing the judgment of the court of appeals, in 23 N. Y. 420. The Indians are the owners of their reservations, subject to the rights of sovereignty of the United States-. United States
 
 v.
 
 Foster, 2 Biss. 377.