### JONES *v.* MEEHAN.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE DISTRICT OF MINNESOTA.

No. 7. Argued April 27, 28, 1898.—Decided October 30, 1899.

A good title to parts of the lands of an Indian tribe may be granted to individuals by a treaty between the United States and the tribe, without any act of Congress, or any patent from the Executive authority of the United States. The question in every case is whether the terms of the treaty are such as to manifest the intention of the parties to make a present grant to the persons named.

A treaty between the United States and an Indian tribe must be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians.

When the United States, in a treaty with an Indian tribe, and as part of the consideration for the cession by the tribe of a tract of country to the United States, make a reservation to a chief or other member of the tribe of a specified number of sections of land, whether already identified, or to be surveyed and located in the future, the treaty itself converts the reserved sections into individual property; the reservation, unless accompanied by words limiting its effect, is equivalent to a present grant of a complete title in fee simple; and that title is alienable by the grantee at his pleasure, unless the United States, by a provision of the treaty, or of an act of Congress, have expressly or impliedly prohibited or restricted its alienation.

The effect of the treaty of October 2, 1863, between the United States and the Red Lake and Pembina bands of Chippewa Indians, by which those bands ceded to the United States all their right, title and interest in a large tract of country, and by which " there shall be set apart from the tract hereby ceded a reservation of six hundred and forty acres near the mouth of the Thief River for the chief Moose Dung," was to grant him an alienable title in fee in the quantity of land at the designated place, subject only to its selection in due form, and to the definition of its boundaries by survey and patent.

The right of inheritance, at the time of the death of the grantee in 1872, in land granted in fee by the United States by an Indian treaty to a member of an Indian tribe, whose tribal organization was still recognized by the Government of the United States, is controlled by the laws, usages and customs of the tribe, and not by the law of the State in which the land lies, nor by any action of the Secretary of the Interior.

The construction of treaties is the peculiar province of the judiciary ; and, except in cases purely political, Congress has no constitutional power to settle the rights under a treaty, or to affect titles already granted by the treaty itself.

THE case is stated in the opinion.

*Mr. James A. Kellogg* for appellant.

*Mr. Cushman K. Davis* for appellees. *Mr. Frank B. Kellogg* and *Mr. C. A. Severance* were with him on the brief.

MR. JUSTICE GRAY delivered the opinion of the court.

This was a bill in equity, filed in the Circuit Court of the United States for the District of Minnesota, by Patrick Meehan and James Meehan, citizens of Wisconsin, against Ray W. Jones, a citizen of Minnesota, to quiet title in a strip of land ten feet wide along the westerly shore of the Red Lake River, in the county of Polk and State of Minnesota, extending from the northeasterly intersection of the plat of the village of Thief River Falls with the shore at a point near the junction of the two rivers, and being a part of lot 1 in section 34, township 154 and range 43.

For convenience, the parties will be designated, throughout this opinion, according to their position in the court below ; the Meehans, now appellees, as the plaintiffs ; and Jones, now appellant, as the defendant.

Each party derived title under the "reservation of six hundred and forty acres near the mouth of Thief River for the chief Moose Dung" in article 9 of the treaty made at the Old Crossing of Red Lake River in the State of Minnesota, on October 2, 1863, between the United States, by their Commissioners, Alexander Ramsay, a Senator of the United States for the State of Minnesota, and Ashley C. Morrill, agent for the Chippewa Indians, of the one part, and the Red Lake and Pembina bands of Chippewa Indians, by their chiefs, headmen and warriors, of the other part, and afterwards ratified by the Senate, with amendments assented to by the Indians. 13 Stat. 667–671. The material provisions of that treaty were as follows:

By article 2, those bands of Chippewas ceded to the United States all their right, title and interest in a large tract of country to the west of Thief River in the State of Minnesota, including all the American valley of the Red River of the North.

By article 3, "In consideration of the foregoing cession, the United States agree to pay to the said Red Lake and Pembina bands of Chippewa Indians the following sums, to wit, twenty thousand dollars per annum for twenty years; the said sum to be distributed among the Chippewa Indians of the said bands in equal amounts per capita."

By article 5, "To encourage and aid the chiefs of said bands in preserving order, and inducing, by their example and advice, the members of their respective bands to adopt the habits and pursuits of civilized life, there shall be paid to each of the said chiefs annually, out of the annuities of the said bands, a sum not exceeding one hundred and fifty dollars, to be determined by their agents according to their respective merits And for the better promotion of the above objects, a further sum of five hundred dollars shall be paid at the first payment to each of the said chiefs to enable him to build for himself a house."

By article 8, "In further consideration of the foregoing cession, it is hereby agreed that the United States shall grant to each male adult half-breed or mixed-blood who is related

by blood to the said Chippewas of the said Red Lake or Pembina bands, who has adopted the habits and customs of civilized life, and who is a citizen of the United States, a homestead of one hundred and sixty acres of land, to be selected at his option, within the limits of the tract of country hereby ceded to the United States, on any land not previously occupied by actual settlers or covered by prior grants, the boundaries thereof to be adjusted in conformity with the lines of the official surveys when the same shall be made, and with the laws and regulations of the United States affecting the location and entry of the same."

By one of the amendments made by the Senate, with the assent of the Indians, there was inserted at the end of article 8 the following : " Provided, that no scrip shall be issued under the provisions of this article, and no assignments shall be made of any right, title or interest at law or in equity until a patent shall issue, and no patent shall be issued until due proof of five years'· actual residence and cultivation, as required by the act entitled ' An act to secure homesteads on the public domain.' "

By article 9 of the treaty, " Upon the urgent request of the Indians, parties to this treaty, there shall be set apart from the tract hereby ceded a reservation of six hundred and forty acres near the mouth of Thief River for the chief Moose Dung, and a like reservation of six hundred and forty acres for the chief Red Bear on the north side of Pembina River."

Moose Dung or Monsimoh was one of the principal chiefs of the Red Lake band of Chippewa Indians, and his name was the first of the Indian signatures to the treaty, all of which were by marks only.

The plaintiffs, against the defendant's objection, introduced in evidence certified copies of extracts from the journal of the proceedings at the negotiation of the treaty, annexed to the report made by Mr. Ramsay to the Commissioner of Indian Affairs in October, 1863. That journal stated that " Moose Dung, who was really the most influential of all the chiefs, stood at the head of a party embracing the large majority of all the bands who were favorable to and even anxious for

a treaty." It also showed that part of the discussion was as follows: Moose Dung said: "I have taken the mouth of Thieving River as my inheritance. I do not ask the chiefs here where I shall go. I make my home there. I wanted it for a reservation for myself." "I used to think that this was the proper place for me to settle; that it would be an inheritance for my children — where all my children could have enough to live on in the future." Mr. Ramsay answered: "Tell him I don't care anything about the mouth of Thieving River. He can have it if he wants it." Moose Dung replied: "I accept of the proposition, because I see that I am going to be raised from want to riches — to be raised to the level of the white man." "You and the Government have used every exertion for a great many years to bring about a treaty. I do not want you to exert yourselves in vain. I now give up the tract of country." The journal further stated that "at the end of a session of three and a half hours' duration Moose Dung, who has stood for an hour weighing and deliberating on every separate provision of this treaty, asking for this explanation and that modification, appearing to labor under a serious sense of the great responsibility he was taking, at last touched the pen which was to affix his vicarious sign-manual to the treaty," and the other chiefs followed his example.

The plaintiffs also, against the like objection, introduced testimony of the secretary of the commission, of the official interpreter, and of other persons, Indians as well as white persons, who were present at the negotiations of the treaty, to the same effect.

Moose Dung selected as his reservation, under the ninth article of the treaty, six hundred and forty acres, a part of which was lot 1 in section 34, including the strip now in controversy; and he lived on that land at the mouth of Thief River, and made it his home, and had a log house, a garden and a fish trap there. He died in 1872, before the lands were surveyed, and was succeeded as chief by his eldest son, who had been born at Red Lake in 1828, and who was known to the whites by the name of Moose Dung or Monsimoh, and to the Indians as Mayskokonoyay, meaning "The one that wears the

red robes;" and, ever since the making of the treaty, his
father and himself, in succession, sustained tribal relations
with the Red Lake band of Chippewa Indians, and that band
continued to be recognized as an Indian tribe by the Govern-
ment of the United States.

On June 27, 1879, the United States Indian agent at White
Earth, Minnesota, wrote to the Commissioner of Indian Affairs
at Washington that Moose Dung the younger, the only surviv-
ing son of Moose Dung named in the treaty, requested that
the land selected by his father might be set aside for his
benefit. On July 25, 1879, the Commissioner of Indian Affairs
answered that Moose Dung the younger should at once locate
the desired lands in accordance with the description in the
treaty; and that it must be shown to the satisfaction of
the Office of Indian Affairs that his father left no other
children. On September 10, 1879, the agent replied that
" the heirs of Moose Dung " had selected the lands (describing
them particularly) that had been selected by the elder Moose
Dung before his death. On September 30, 1879, the Secretary
of the Interior, on the recommendation of the Commissioner
of Indian Affairs, approved " the selection made by the heirs of
Moose Dung," and directed the Commissioner of the General
Land Office to " take the necessary steps for the protection of
the said lands so reserved for the benefit of those entitled, as
contemplated by the treaty stipulations;" and they were
thereupon set apart accordingly, and were designated on all
government maps as " Moose Dung's reservation."

From the time of this selection Moose Dung the younger
lived upon, exercised dominion over, and claimed to own, the
land so selected, and cultivated part of it, leased other parts
of it for pasturage, and sold sand off it.

On November 7, 1891, Moose Dung the younger, describing
himself as " Moose Dung, of Thief River Falls, Polk County,
Minnesota," made a lease to the plaintiffs, for ten years, at an
annual rent of twenty-five dollars, of this strip of land and all
shore rights for storing logs, erecting piles and booms, and for
all purposes connected with lumbering; and he affixed to it
his mark and seal, and acknowledged it before a notary public,

after its contents had been fully explained to him through an interpreter. On November 10, 1891, this lease was recorded in the registry of deeds for the county. The plaintiffs accepted the lease and paid the rent according to its terms; and in 1892 they erected a large saw-mill on the bank of Thief River, a short distance below the strip leased, and entered upon this strip, drove piles and strung booms in the river opposite, and stored logs there, and thenceforth used the strip as one shore of the mill-pond appurtenant to their saw-mill.

The land selected by Moose Dung was near the village of Thief River Falls, which, when this lease was made, contained some fifty inhabitants and had no railroad and no important industry, and land there was of little value. But in 1892, after the erection of the plaintiffs' saw-mill, the Great Northern Railway Company built a railroad to the village, a large settlement sprang up there, and the land increased in value.

On July 20, 1894, Moose Dung the younger, describing himself as " Monsimoh, (commonly called Moose Dung,) heir and successor of his father Monsimoh, (also commonly called Moose Dung,)" made a lease of the whole of lot 1 in section 34, and of all appurtenances and riparian rights thereto belonging, for twenty years, to the defendant, at an annual rent of two hundred dollars; and on July 23, 1894, this lease was recorded in the registry of deeds. The defendant, at the time of obtaining this lease, knew of the prior lease and possession of the plaintiffs. On August 4, 1894, Congress passed a joint resolution authorizing the Secretary of the Interior "to approve, if in his discretion he deems the same proper and advisable, and upon such terms as he may impose," this lease to the defendant. 28 Stat. 1018. On December 27, 1894, the Secretary of the Interior approved this lease, upon condition (to which both the lessor and the lessee assented) that the annual rent should be four hundred dollars, and " be paid to the agent in charge of the Chippewa Indians in Minnesota, and by him paid to the parties found to be entitled thereto by this Department," and should be readjusted every five years, and " the said premises, nor any part thereof, shall not be sublet

without the written consent of the lessor, his heirs or assigns, and the approval of the Secretary of the Interior."

The Circuit Court held that the reservation in the treaty to the elder Moose Dung was in the nature of a grant of title to him, burdened with no restriction or condition save that of selection and identification; that upon the selection and location the title in the selected lands vested in Moose Dung the younger as his eldest son and successor; that the latter's lease of November 9, 1891, to the plaintiffs was a valid and subsisting lease of the strip in controversy, and needed no approval by the Secretary of the Interior; that the lease made on July 20, 1894, to the defendant, and approved by the Secretary of the Interior, was subordinate to the lease to the plaintiffs, and, as against them, conveyed no right to the occupancy or use of the strip; and that the plaintiffs were entitled to have the rights and privileges under the earlier lease vested and quieted in them as against the claims of the defendant. 70 Fed. Rep. 453. The defendant appealed to this court.

The fundamental question in the case is, What was the nature of the title which the elder chief Moose Dung took under the treaty of October 2, 1863, between the United States and the Red Lake and Pembina bands of Chippewa Indians? Was it a mere right of occupancy, with no power to convey the land except to the United States or by their consent? Or was it substantially a title in fee simple with full power of alienation?

Undoubtedly, the right of the Indian nations or tribes to their lands within the United States was a right of possession or occupancy only; the ultimate title in fee in those lands was in the United States; and the Indian title could not be conveyed by the Indians to any one but the United States, without the consent of the United States. *Johnson* v. *McIntosh,* 8 Wheat. 543; *Cherokee Nation* v. *Georgia,* 5 Pet. 1, 17; *Worcester* v. *Georgia,* 6 Pet. 515, 544; *Doe* v. *Wilson,* 23 How. 457, 463; *United States* v. *Cook,* 19 Wall. 591; *United States* v. *Kagama,* 118 U. S. 375, 381; *Butts* v. *Northern Pacific Railroad,* 119 U. S. 55, 67. In the leading case of *Johnson* v. *McIntosh,* (1823) it was therefore held that grants of lands

northwest of the river Ohio, made in 1773 and 1775 by the chiefs of certain Indian tribes, constituting the Illinois and the Pinkeshaw nations, to private individuals, conveyed no title which could be recognized in the courts of the United States; and Chief Justice Marshall, in delivering judgment, said: "The usual mode adopted by the Indians for granting lands to individuals has been to reserve them in a treaty, or to grant them under the sanction of the commissioners with whom the treaty was negotiated." 8 Wheat. 598.

Accordingly, by several early treaties between the United States of the one part, and the Chippewas and other Indian nations of the other part, the said Indian nations acknowledged themselves to be under the protection of the United States, and of no other sovereign whatever; the United States relinquished and quitclaimed to the said nations respectively all the lands lying within certain limits, to live and hunt upon, and otherwise occupy as they saw fit; but the said nations, or either of them, were not to be at liberty to dispose of those lands, except to the United States. Treaties of January 1, 1785, art. 2; January 9, 1789, art. 3; August 3, 1795, arts. 4, 5; 7 Stat. 16, 29, 52.

Soon after the adoption of the Constitution, the same doctrine was repeatedly recognized and enforced by Congress in temporary acts regulating trade and intercourse with the Indian tribes. By the act of July 22, 1790, c. 33, § 4, it was "enacted and declared that no sale of lands made by any Indians, or any nation or tribe of Indians, within the United States, shall be valid, to any person or persons, or to any State, whether having the right of preëmption to such lands or not, unless the same shall be made and duly executed at some public treaty held under the authority of the United States." 1 Stat. 138. In the act of March 1, 1793, c. 19, § 8, the corresponding provision was that "no purchase or grant of lands, or of any title or claim thereto, from any Indians, or nation or tribe of Indians, within the bounds of the United States, shall be of any validity, in law or equity, unless the same be made by a treaty or convention entered into pursuant to the Constitution." 1 Stat. 330. In the acts of May 19, 1796, c. 30,

§ 12, and March 3, 1799, c. 46, § 12, this provision was reënacted, substituting for the words "purchase or grant" the words "purchase, grant, lease or other conveyance," and for the words "any Indians," in the plural, the words "any Indian," in the singular, so as to read : "No purchase, grant, lease or other conveyance of lands, or of any title or claim thereto, from any Indian, or nation or tribe of Indians, within the bounds of the United States, shall be of any validity, in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution."   1 Stat. 472, 746. And this language of the temporary acts of 1796 and 1799 was repeated in the first permanent enactment upon the subject, being the act of March 30, 1802, c. 13, § 12.   2 Stat. 143.

It is well settled that a good title to parts of the lands of an Indian tribe may be granted to individuals by a treaty between the United States and the tribe, without any act of Congress, or any patent from the Executive authority of the United States. · *Johnson* v. *McIntosh*, 8 Wheat. above cited ; *Mitchel* v. *United States*, 9 Pet. 711, 748 ; *Doe* v. *Beardsley*, 2 McLean, 417, 418 ; *United States* v. *Brooks*, 10 How. 442, 460 ; *Doe* v. *Wilson*, 23 How. 457, 463 ; *Crews* v. *Burcham*, 1 Black, 356 ; *Holden* v. *Joy*, 17 Wall. 211, 247 ; *Best* v. *Polk*, 18 Wall. 112, 116 ; *New York Indians* v. *United States*, 170 U. S. 1. The question in every case is whether the terms of the treaty are such as to manifest the intention of the parties to make a present grant to the persons named.

The Indian tribes within the limits of the United States are not foreign nations ; though distinct political communities, they are in a dependent condition ; and Chief Justice Marshall's description, that "they are in a state of pupilage," and "their relation to the United States resembles that of a ward to his guardian," has become more and more appropriate as they have grown less powerful and more dependent. *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17 ; *Elk* v. *Wilkins*, 112 U. S. 94, 99 ; *United States* v. *Kagama*, 118 U. S. 375, 382, 384 ; *Stephens* v. *Choctaw Nation*, 174 U. S. 445, 484.

In construing any treaty between the United States and an

Indian tribe, it must always (as was pointed out by the counsel for the appellees) be borne in mind that the negotiations for the treaty are conducted, on the part of the United States, an enlightened and powerful nation, by representatives skilled in diplomacy, masters of a written language, understanding the modes and forms of creating the various technical estates known to their law, and assisted by an interpreter employed by themselves; that the treaty is drawn up by them and in their own language; that the Indians, on the other hand, are a weak and dependent people, who have no written language and are wholly unfamiliar with all the forms of legal expression, and whose only knowledge of the terms in which the treaty is framed is that imparted to them by the interpreter employed by the United States; and that the treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians. *Worcester* v. *Georgia*, 6 Pet. 515; *The Kansas Indians*, 5 Wall. 737, 760; *Choctaw Nation* v. *United States*, 119 U. S. 1, 27, 28. In the case of *Worcester* v. *Georgia*, (1832) Chief Justice Marshall, speaking of article 4 of the treaty of Hopewell of November 28, 1785, between the United States and the Cherokee Indians, which defined " the boundary allotted to the Cherokees for their hunting grounds, between the said Indians and the citizens of the United States," (7 Stat. 19,) said : " There is the more reason for supposing that the Cherokee chiefs were not very critical judges of the language, from the fact that every one makes his mark; no chief was capable of signing his name. It is probable the treaty was interpreted to them." " Is it reasonable to suppose that the Indians, who could not write, and most probably could not read, who certainly were not critical judges of our language, should distinguish the word ' allotted' from the words ' marked out' ? " 6 Pet. 551, 552. And Mr. Justice McLean, concurring, said : " The language used in treaties with the Indians should never be construed to their prejudice." " To contend that the word ' allotted,' in reference to the lands guarantied to the Indians in certain treaties indicates a favor conferred, rather than a right ac-

knowledged, would, it would seem to me, do injustice to the understanding of the parties. How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction." 6 Pet. 582.

The defendant's counsel at the argument relied on an opinion given by Chief Justice Taney, when Attorney General, under the following circumstances: By the treaty made at Camp Tippecanoe in the State of Illinois on October 20, 1832, between the United States and the Pottawatomie tribe of Indians of the Prairie and Kaukakee, (while the act of March 30, 1802, c. 13, was in force,) that tribe ceded a large tract of land in Illinois to the United States, and it was provided that "from the cession aforesaid the following tracts shall be reserved, to wit," a certain number of sections to each of particular Indians named. 7 Stat. 378. On September 20, 1833, Attorney General Taney gave an opinion to the Secretary of War that "these reservations are excepted out of the grant made by the treaty, and did not therefore pass by it; consequently, the title remains as it was before the treaty; that is to say, the lands reserved are still held under the original Indian title;" and therefore "the Indian occupants cannot convey them to individuals, and no valid cession can be made of their interest but to the United States." 2 Opinions of Attorneys General, 587.

But within a year after that opinion was given, and perhaps in consequence thereof, Congress, in framing a new act regulating trade and intercourse with the Indian tribes, omitted the prohibition, contained in former statutes, of purchases or leases from "any Indian," and put the provision invalidating Indian conveyances in this altered form: " No purchase, grant, lease or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity, in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." Act of June 30, 1834, c. 161, § 12; 4 Stat. 730. The declaration, retained in this act, of the invalidity of purchases and leases "from any nation or tribe of

Indians," might include a purchase or lease from any Indian acting by authority derived from his tribe only. *Johnson* v. *McIntosh*, 8 Wheat. 543, 593; *Smith* v. *Stevens*, 10 Wall. 321, 323; *Goodell* v. *Jackson*, 20 Johns. 693, 723. But the inference appears to us to be irresistible that Congress did not intend that there should thenceforth be any general restriction upon the alienation by individual Indians of sections of land reserved to them respectively by a treaty with the United States. And this view is confirmed by the reënactment of the provision, in the very words of the act of 1834, in section 2116 of the Revised Statutes, and by the course of decision in this court in a series of opinions which may conveniently be considered in their chronological order.

The supplementary articles of September 28, 1830, to the treaty of Dancing Rabbit Creek of September 27, 1830, between the United States and the Choctaw Nation of Indians, making provision for "various Choctaw persons," used, as synonymous expressions, the phrases "shall be entitled to a reservation of," " is allowed a reservation of," " there shall be granted," " there is given," or " is granted," sections of land, either including the present residence and improvement of such persons, or to be located on any unimproved and unoccupied land. 7 Stat. 340. In *Gaines* v. *Nicholson*, (1850) 9 How. 356, Mr. Justice Nelson, in delivering the opinion of the court, did say of such a reservation: " It was so much carved out of the territory ceded, and remained to the Indian occupant, as he had never parted with it. He holds, strictly speaking, not under the treaty of cession, but under his original title confirmed by the Government in the act of agreeing to the reservation." 9 How. 365. But that treaty was made before the act of Congress of 1834; the only question in the case was of the effect of the reservation as against a previous grant of land by Congress to a State for the support of schools; the court had no occasion to define, and did not undertake to define, the exact nature of the title granted or confirmed by the treaty; and the suggestion, in accordance with Attorney General Taney's opinion, above cited, that the treaty rather confirmed the Indian right than granted a new

title, can hardly be reconciled with the later judgments of the court, to be presently considered, one of which was delivered by the same learned judge. *Crews* v. *Burcham*, 1 Black, 352.

In concluding the treaty of July, 1, 1835, between the United States and the Caddo nation of Indians, in Louisiana, supplementary articles were added, by which, after a recital that that nation had in 1801 granted to one Francis Grappe (who was a half-blood Caddo) and to his three sons a league land of each, " it is agreed " that Grappe's legal representatives and his said three sons " shall have their right to the said four leagues of land reserved to them, and their heirs and assigns forever. The said land to be taken out of the lands ceded to the United States by the said Caddo nations of Indians as expressed in the treaty to which this article is supplementary. And the said four leagues of land shall be laid off in one body," at a place described, in conformity with the boundaries " expressed in the original deed of gift " from the Caddo nation to Grappe and his three sons. 7 Stat. 473. In *United States* v. *Brooks*, (1850) 10 How. 442, it was argued for the United States that the effect of this agreement was simply that the Grappes should retain their right, whatever it might be, under the reservation of 1801; and that that reservation was not authorized by the laws then in force there. But it was adjudged that its effect was to vest in the Grappes an absolute title in fee simple, which they might convey to any one; the court, speaking by Mr. Justice Wayne, saying: " We think that the treaty gave to the Grappes a fee simple title to all the rights which the Caddoes had in these lands, as fully as any patent from the government could make one. The reservation to the Grappes, 'their heirs and assigns forever,' creates as absolute a fee as any subsequent act upon the part of the United States could make. Nothing further was contemplated by the treaty to perfect the title. Brooks being the alienee of the Grappes for the entire reservation, he may hold it against any claim of the United States, as his alienors would have done." 10 How. 460. In that case, therefore, an agreement that the persons named " shall have their right "

to " certain lands reserved," and the lands " shall be laid off," was given the same effect as a present grant or patent. It is true that the treaty there in question reserved the right to those persons, " and their heirs and assigns forever." But the like construction has since been given to reservations unaccompanied by any words of inheritance.

By the first article of a treaty made on the Tippecanoe River in the State of Indiana on October 27, 1832, between the United States and the Pottawatomies of that State and of Michigan Territory, that tribe of Indians ceded their title and interest to lands in Indiana, Illinois and Michigan to the United States. By article 2, " from the cession aforesaid the following reservations are made " to certain bands of Indians. And by article 3, " the United States agree to grant to each of the following persons the quantity of land annexed to their names, which lands shall be conveyed to them by patent." " The foregoing reservations shall be selected, under the direction of the President of the United States, after the lands shall have been surveyed, and the boundaries to correspond with the public surveys." 7 Stat. 399–401.

In *Doe* v. *Wilson*, (1859) 23 How. 457, it was held, in an action of ejectment, that a warranty deed made by Petchico, (a Pottawatomie chief, one of the persons named in the third article of that treaty,) in February, 1833, to citizens of Indiana, before the lands had been surveyed, or a patent granted, passed a good title as against a deed made by his heirs after the issue of the patent and his death. The court, speaking by Mr. Justice Catron, said : " The Pottawatomie nation was the owner of the possessory right of the country ceded, and all the subjects of the nation were joint owners of it. The reservees took by the treaty, directly from the nation, the Indian title ; and this was the right to occupy, use and enjoy the lands, in common with the United States, until partition was made in the manner prescribed." This sentence has sometimes been supposed to indicate that by the treaty the reservees took directly from the Indian nation its possessory right only, defined as " the right to occupy, use and enjoy the lands in common with the United States." But this was qualified by

the concluding words of the same sentence, "until partition
was made in the manner prescribed," that is to say, by the
treaty. And the court went on to say, in the most distinct
terms : "The treaty itself converted the reserved sections into
individual property. The Indians as a nation reserved no
interest in the territory ceded; but, as a part of the considera-
tion for the cession, certain individuals of the nation had con-
ferred on them portions of the land, to which the United
States title was either added or promised to be added; and it
matters not which, for the purposes of this controversy for
possession. The United States held the ultimate title, charged
with the right of undisturbed occupancy and perpetual posses-
sion in the Indian nation, with the exclusive power in the Gov-
ernment of acquiring the right. Although the Government
alone can purchase lands from an Indian nation, it does not
follow that, when the rights of the nation are extinguished,
an individual of the nation who takes as private owner cannot
sell his interest. The Indian title is property, and alienable
unless the treaty had prohibited its sale. So far from this
being the case in the instance before us, it is manifest that
sales of the reserved sections were contemplated, as the lands
ceded were forthwith to be surveyed, sold and inhabited by a
white population, among whom the Indians could not remain."
23 How. 463, 464.

In *Crews* v. *Burcham*, (1861) 1 Black, 352, a warranty deed
made by Francis Besion, another person named in the third
article of that treaty, under like circumstances, to one Arm-
strong, was accordingly held to vest the legal title in him ;
and the scope and effect of the decision in *Doe* v. *Wilson* were
clearly brought out in the opinion delivered by Mr. Justice
Nelson, as follows: "It was there held, that the reservation
created an equitable interest in the land to be selected under
the treaty; that it was the subject of sale and conveyance;
that Petchico was competent to convey it; and that his deed,
upon the selection of the land and the issue of the patent,
operated to vest the title in his grantee. It is true that no
title to the particular lands in question could vest in the
reservee, or in his grantee, until the location by the President,

and, perhaps, the issuing of the patent; but the obligation to make the selection as soon as the lands were surveyed, and to issue the patent, is absolute and imperative, and founded upon a valuable and meritorious consideration. The lands reserved constituted a part of the compensation received by the Pottawatomies for the relinquishment of their right of occupancy to the Government. The agreement was one which, if entered into by an individual, a court of chancery would have enforced by compelling the selection of the lands and the conveyance in favor of the reservee, or, in case he had parted with his interest, in favor of his grantees. And the obligation is not the less imperative and binding, because entered into by the Government. The equitable right, therefore, to the lands, in the grantee of Besion, when selected, was perfect; and the only objection of any plausibility is the technical one as to the vesting of the legal title." "We think it quite clear, if this patent had issued to Besion in his lifetime, the title would have inured to his grantee. The deed to Armstrong recites the reservation to the grantee of the half section under the treaty, and that it was to be located by the President after the lands were surveyed; and then, for a valuable consideration, the grantee conveys all his right and title to the same with a full covenant of warranty. The land is sufficiently identified to which Besion had the equitable title, which was the subject of the grant, to give operation and effect to this covenant on the issuing of the patent, within the meaning of this act of Congress. [Act of May 20, 1836, c. 76; 5 Stat. 31.] The act declares the land shall inure to, and become vested in, the assignee, the same as if the patent had issued to the deceased in his lifetime." "Some expressions in the opinion delivered in the case of *Doe* v. *Wilson*, the first case that came before us arising out of this treaty, were the subject of observations by the learned counsel for the appellant in the argument, but which were founded on a misapprehension of their scope and purport. It was supposed that the court had held that the reservee was a tenant in common with the United States after the treaty of cession and until the survey and patent. It will be seen, however, that the tenancy in common there mentioned

referred to the right to occupy, use and enjoy the land in common with the Government, and had no relation to the legal title." 1 Black, 356, 357.

By those two decisions it was determined that the "reservations," created by the treaty with the Pottawatomies of October 27, 1832, in favor of individual Indians, by the words "the United States agree to grant" to each of them sections of land, "which lands shall be conveyed to them by patent," had the effect of granting a present and alienable interest to each. In both those decisions Chief Justice Taney concurred — which is worthy of special notice in view of the different opinion, above cited, which he had given, when Attorney General, upon the effect of similar reservations in a treaty made with another band of Pottawatomies seven days earlier, but promulgated by the President at the same time as this treaty. 7 Stat. 378, 399. And the two decisions were cited and approved by this court, speaking of Mr. Justice Matthews, in *Prentice* v. *Stearns*, (1885) 113 U. S. 435, 446, 447. See also the opinion delivered by Mr. Justice Miller in the Circuit Court in *Prentice* v. *Northern Pacific Railroad*, (1890) 43 Fed. Rep. 270, 275.

In the treaty of June 3, 1825, between the United States and the Kansas nation of Indians, it was provided, by article 6, that from the lands thereby ceded to the United States there should be made reservations of one mile square for each of the half-breeds named; and, by article 11, that "the said Kansas nation shall never sell, relinquish or in any manner dispose of the lands, herein reserved, to any other nation, person or persons whatever, without the permission of the United States for that purpose first had and obtained." 7 Stat. 245, 247. The act of Congress of May 26, 1860, c. 61, after reciting that the lands so reserved had been surveyed and allotted to each of the half-breeds in accordance with article 6 of the treaty, enacted that "all the title, interest and estate of the United States is hereby vested in the said reservees, who are now living, to the land reserved, set apart and allotted to them," and in the heirs of those deceased, "but nothing herein contained shall be construed to give any

force, efficacy or binding effect to any contract, in writing or otherwise, for the sale or disposition of any lands named in this act, heretofore made by any of said reservees or their heirs ; " and it was further enacted that if any of the reservees, or the heirs of any one deceased, should not desire to occupy the lands to which they were entitled by the provisions of this act, the Secretary of the Interior, upon their request, should be authorized to sell the lands for their benefit, and to issue patents to the purchasers.    12 Stat. 21.    In *Smith* v. *Stevens,* (1870) a deed made by one of those half-breeds, shortly after the passage of that act, without the authority or assent of the Secretary of the Interior, was adjudged by this court, speaking to Mr. Justice Davis, to be void, upon the single ground " that the statute, having provided the way in which these half-breed lands could be sold, by necessary implication prohibited their sale in any other way."    10 Wall. 321, 326.

By the treaty with the Chickasaws of May 24, 1834, it was agreed, in article 5, that " the following reservations be granted in fee : To heads of families, being Indians or having Indian families," a certain number of sections of land; and, by article 6, " also reservations of a section to each shall be granted to " other members of the tribe, of the age of twenty-one years and upwards, according to a list to be made out by seven chiefs named in the treaty, and filed with the agent, " upon whose certificate of its believed accuracy the register and receiver shall cause said reservations to be located upon lands fit for cultivation."    7 Stat. 451, 452.    It may be observed that article 6, differing in these respects from article 5, used the future tense, " shall be granted," and omitted the words " in fee.".    Yet in *Best* v. *Polk,* (1873) 18 Wall. 112, this court held that the treaty itself conferred a full title upon an Indian to whom lands were reserved by article 6, and, again speaking by Mr. Justice Davis, said : " Can it be doubted that it was the intention of both parties to the treaty to clothe the reservees with the full title ?    If it were not so, there would have been some words of limitation indicating a contrary intention.    Instead of this, there is nothing to show that a further grant, or any additional evidence of title, were

contemplated. Nor was this necessary, for the treaty pro-
ceeded on the theory that a grant is as valid by a treaty as by
an act of Congress, and does not need a patent to perfect it.
We conclude, therefore, that the treaty conferred the title to
these reservations, which was complete when the locations
were made to identify them." 18 Wall. 116. "The treaty
granted the land, but the location had to be fixed before the
grant could become operative. After this was done, the
estate became vested and the right to it perfect, as much so
as if the grant had been directly executed to the reservee."
18 Wall. 118. In support of that conclusion, this court cited
decisions of the highest court of the State of Mississippi, in
which, after quoting the words of article 6 of the treaty, it
was said: "By this language, a title in fee passed to such
persons as were above the age of twenty-one. The term
'reservation' was equivalent to an absolute grant. The title
passed as effectually as if a grant had been executed." "The
treaty has not contemplated a further grant, or other evidence
of title — showing conclusively that by the terms used it was
intended that a perfect title was thereby intended to be
secured. The Indian, then, under whom complainants claim,
had in herself an absolute and unconditional title in fee sim-
ple. The title was conferred by the treaty; it was not how-
ever perfect until the location was made; location was neces-
sary to give identity. The location it seems was duly made,
and thus the title to the land in controversy was consummated
by giving identity to that which was before unlocated."
*Niles* v. *Anderson*, (1841) 5 How. (Miss.) 365, 383; *Wray* v.
*Doe*, (1848) 10 Sm. &. Marsh. 452, 461.

In the treaty of June 24, 1862, between the United States
and a tribe of Ottawa Indians, article 3 provided as follows:
"It being the wish of said tribe of Ottawas to remunerate
several of the chiefs, councilmen and headmen of the tribe for
their services to them many years without pay, it is hereby
stipulated that five sections of land are reserved and set apart
for that purpose, to be apportioned among the said chiefs,
councilmen and headmen as the members of the tribe shall in
full council determine; and it shall be the duty of the Secre-

tary of the Interior to issue patents in fee simple of said lands, when located and apportioned, to said Indians." 12 Stat. 1238. In *Libby* v. *Clark*, (1886) 118 U. S. 250, this court, approving and affirming the judgment of the Supreme Court of Kansas, delivered by Mr. Justice Brewer, in 14 Kansas, 435, held that a deed to a white person from one of those chiefs, of land patented to him pursuant to the treaty, but executed before he had become a citizen of the United States, was void, for the single reason that the treaty itself, as construed by the court, expressly provided, in article 7, that no Indian should alien or incumber the land allotted to him until he had, according to the terms of the treaty, become a citizen of the United States.

In the Treaty of Prairie du Chien of July 29, 1829, between the United States and certain nations of Chippewa, Ottawa and Pottawatomie Indians, article 4, by which "there shall be granted by the United States" to each of the persons named, being descendants from Indians, sections of land, it was provided that "the tracts of land herein stipulated to be granted shall never be leased or conveyed by the grantees or their heirs to any persons whatever without the permission of the President of the United States." 7 Stat. 321. Of course, under such a provision, no alienation could be valid without the approval of the President. *Pickering* v. *Lomax*, (1892) 145 U. S. 310; *Lomax* v. *Pickering*, (1899) 173 U. S. 26.

The clear result of this series of decisions is that when the United States, in a treaty with an Indian tribe, and as part of the consideration for the cession by the tribe of a tract of country to the United States, make a reservation to a chief or other member of the tribe of a specified number of sections of land, whether already identified, or to be surveyed and located in the future, the treaty itself converts the reserved sections into individual property; the reservation, unless accompanied by words limiting its effect, is equivalent to a present grant of a complete title in fee simple; and that title is alienable by the grantee at his pleasure, unless the United States, by a provision of the treaty, or of an act of Congress, have expressly or impliedly prohibited or restricted its alienation.

The letters of the Commissioner of Indian Affairs, referred to in the supplemental brief of the defendant, expressing the views entertained in his office at sundry times as to the effect of a reservation in an Indian treaty to particular Indians without words of present grant, or of inheritance, were, for the most part, written before the subject had been considered by this court; and they fall far short of establishing such a uniform practical construction of the term by the Executive Departments as would warrant the court in overruling its own opinions as expressed in the cases above stated.

The treaty of October 2, 1863, between the United States and the Red Lake and Pembina bands of Chickasaw Indians, now before the court, contains in itself peculiarly strong evidence that it was intended to vest in the elder chief Moose Dung a full and complete title in the land reserved to him.

According to the decisions above cited, such would be the construction of the ninth article, taken by itself, by which "upon the urgent request of the Indians, parties to this treaty, there shall be set apart from the tract hereby ceded a reservation of six hundred and forty acres near the mouth of Thief River for the chief Moose Dung, and a like reservation of six hundred and forty acres for the chief Red Bear on the north side of Pembina River." And this construction is fortified by other provisions of the treaty, quoted at the beginning of this opinion.

By the eighth article, it is "agreed that the United States shall grant to" each male adult half-breed or mixed-blood who is related by blood to these Indians, who has adopted the habits and customs of civilized life, and who is a citizen of the United States, a homestead of one hundred and sixty acres, to be selected out of the tract ceded, and in conformity with the official surveys when made. That article was amended by the Senate by providing that no scrip should be issued under its provisions, and no assignment should be made of any right, title or interest before the issue of a patent, and no patent should be issued until due proof of five years' actual residence and cultivation, as required by the homestead act. Act of May 20, 1862, c. 75; 12 Stat. 392; Rev. Stat. §§ 2289, 2291.

The reservations of four times as much land to each of the chiefs Moose Dung and Red Bear under the ninth article were not made subject, by any provision of the original treaty, or of the Senate amendments, to the condition of adopting the habits and customs of civilized life, or of becoming a citizen of the United States, or of five years' actual residence and cultivation. But by the fifth article, with the avowed objects " to encourage and aid the chiefs of said bands in preserving order, and inducing, by their example and advice, the members of their respective bands to adopt the habits and pursuits of civilized life," each chief was to be paid, not only a certain sum annually out of the annuities payable to the bands by the treaty, but also, at the time of the first payment, a further sum of five hundred dollars " to enable him to build for himself a house."

The provisions of that article are wholly inconsistent with the theory that the title of the chiefs Moose Dung and Red Bear respectively in the reservation of six hundred and forty acres each, unconditionally set apart for them, was to be less absolute than the title of the half-breeds in their homesteads would be after the conditions of the treaty respecting them had been complied with.

The only reasonable construction of all the provisions of the treaty, taken together, is that the ninth article, by which " there shall be set apart from the tract hereby ceded a reservation of six hundred and forty acres near the mouth of the Thief River for the Chief Moose Dung," and a reservation of a like quantity of land at another place designated for the chief Red Bear, was intended by the United States, and was understood by the Indians, and took effect, as a present grant to each of these two chiefs of an alienable title in fee in that quantity of land at the designated place, subject only to its selection in due form, and to the definition of its boundaries by survey and patent.

Such being in our opinion the construction and effect of the terms of the treaty itself, it is unnecessary to consider the competency of the extrinsic evidence, offered by the plaintiffs, of what took place between the representatives of the parties

at the negotiations which preceded its execution; for, whether that evidence be admitted or rejected, the conclusion must be the same.

Nor is it necessary to consider particularly the argument of the plaintiffs, founded upon the citizenship acquired by Moose Dung the younger under that provision of the act of February 8, 1887, c. 119, § 6, by which "every Indian born within the territorial limits of the United States, to whom allotments shall have been made under the provisions of this act, or under any law or treaty," is "declared to be a citizen of the United States, whether said Indian had been or not by birth or otherwise. a member of any tribe of Indians within the territorial limits of the United States, without in any manner impairing or otherwise affecting the rights of any such Indian to tribal or other property." 24 Stat. 390. That provision might not enable individual Indians to alienate lands which were not before alienable. *Beck* v. *Flournoy Co.*, 27 U. S. App. 618; *Eells* v. *Ross*, 29 U. S. App. 59; *Coombs, petitioner*, 127 Mass. 278. But it certainly does not take away a power of alienation conferred by the treaty under which the allotment was made.

Another question of importance, fully argued at the bar, is whether Moose Dung the younger inherited all his father's rights in the reservation. This question is presented by the record in a peculiar aspect.

In the amended bill (which is the only one in the record transmitted to this court) the plaintiffs claimed title under the lease made to them by Moose Dung the younger on November 7, 1891, and alleged that at the date of that lease he was the owner in fee simple of the lands in question.

In the answer filed January 15, 1895, to that bill, the defendant denied its allegations; and claimed title under the reservation to Moose Dung the elder in the treaty, his selection of lands and the setting apart of them by the Government as such reservation, and the lease executed by Moose Dung the younger, (so the answer alleged, in substantial accord with the form of the lease itself,) "as his oldest son, heir at law and successor as chief of the Red Lake band of Chippewa Indians,"

to the defendant, on July 20, 1894, as afterwards amended and approved by the Secretary of the Interior; and alleged that the Government, ever since its setting apart of the reservation, " conceded, treated and designated said selection as a reservation which said Moose Dung was entitled to possess and control, subject however to the control of the overseers and agents of the Government of the United States." The plaintiffs filed a general replication to the answer.

The testimony in the case was taken, under order of the court, by a special examiner, before whom (as appears by the record) the following proceedings were had, at the dates mentioned below:

On May 21, 1895, the plaintiffs introduced the deposition of John George Morrison, who testified that he was fifty-five years old, was a Scotch half-breed and had a quarter of Chippewa blood, had lived with the Red Lake band of Chippewa Indians all his life, spoke both English and Chippewa, was a special interpreter at the negotiation of the treaty, and was acquainted with the laws, customs and usages of the Chippewa Indians; and that, according to those laws, customs and usages, a chief like the elder Moose Dung had the right to select a piece of land and to use it as his home, and upon his death his eldest son would inherit all his land, and succeed to his office and powers as chief of the band; and the witness was not cross examined on this point.

On June 8, 1895, while the defendant was putting in evidence in support of his title as alleged in the answer, "it was admitted by the complainants' solicitor that the living chief Monsimoh was the eldest son and successor to all rights of his father under the treaty of October 2, 1863, and the son of the chief Monsimoh who signed that treaty."

On July 15, 1895, the plaintiffs put in evidence the complaint in an action brought by this defendant against them on February 15, 1895, containing an allegation that, upon the death of the old chief Moose Dung, " his son, Monsimoh, commonly called and known as Moose Dung, survived him and became the sole heir at law and successor of the said Moose Dung, deceased, and thereby succeeded to, has ever since held

and does now hold all the right, title and interest in and privileges pertaining to said premises, as such heir at law and successor of the said deceased chief Moose Dung."

On July 23 and 24, 1895, the defendant introduced testimony of Moose Dung the younger, and of other Indians, showing that his father had two wives, both living at the same time, and left six surviving descendants: three children, (1) Moose Dung the younger, the eldest son by the first wife, (2) a daughter by the first wife, and (3) a daughter by the second wife ; and three grandchildren, (4) a son of a deceased daughter by the first wife, (5) a daughter of a deceased daughter by the first wife, and (6) a son of a deceased son by the second wife.

Moose Dung the younger, when so examined as a witness for the defendant, testified, on cross examination, that he owned the land in question ; that his father, when he died, left the land to him alone; and that by the customs of the Red Lake Indians he, upon the death of his father, being his eldest son by his first wife, succeeded him as chief, and was entitled to succeed to all his land; and, being asked, "Who first spoke to you about these other sisters and children having some interest in the land?" answered, "No one said anything to me about it."

On August 1, 1895, the defendant introduced, against the plaintiffs' objection that they were incompetent and immaterial, and not within the issues of the case, certified copies, from the records of the Department of the Interior, of certain documents respecting the disposition of $100 deposited with the Indian agent at White Earth, Minnesota, by the defendant, as rent due under the lease to him from Moose Dung the younger, as amended and approved by the Secretary of the Interior, which documents were as follows: 1st. A letter, dated February 4, 1895, from the Commissioner of Indian Affairs to the Indian agent, directing the agent "to fully investigate the subject as to who are the legal heirs of old chief Moose Dung, for the purpose of ascertaining to whom said rent should be paid;" to submit all the evidence in the matter in the form of affidavits, with a full report and recommendation; to per-

mit Moose Dung the younger, if he so desired, to be present in person or by attorney at the hearing ; to take his affidavit as part of the evidence ; and to hold the money paid by the defendant in the agent's hands to await the determination of the Commissioner. 2d. The report, dated March 30, 1895, of the Indian agent to the Commissioner of Indian Affairs, enclosing an affidavit, taken on that day, of Moose Dung the younger, stating that he and the two daughters and three grandchildren above mentioned were the only legal heirs of his father, and that they were entitled to share equally with him in the estate, and were all of legal age; affidavits, taken March 5, 1895, of those daughters and grandchildren respectively, stating their relationship and ages, and that they were entitled to share equally with him in the estate; and an affidavit, of the same date, of chiefs and headmen of the tribe to the relationship of the other deponents to Moose Dung the elder, but saying nothing as to their rights of inheritance. Each of these affidavits was signed with the mark of the deponent, and taken by a notary public. The agent reported that he considered this evidence reliable, and had no doubt that these six descendants of the old chief Moose Dung were his only living heirs, and were entitled to share equally in his estate. 3d. A letter, dated April 9, 1895, from the Commissioner of Indian Affairs to the Secretary of the Interior, recommending that these six persons " be determined to be the heirs of old chief Moose Dung for the purposes of this lease, and that the rents arising from leasing the land granted him by said treaty be divided among them equally." 4th. A letter, dated April 23, 1895, from the Secretary of the Interior to the Commissioner of Indian Affairs, concurring in the recommendation, and returning the papers. 5th. A letter, dated May 4, 1895, from the Commissioner of Indian Affairs to the Indian agent, informing him of the decision of the Secretary of the Interior, and directing him to distribute the proceeds of the lease in his hands in accordance with that decision.

The defendant, at the same time, against the like objection, introduced six receipts, dated May 25, 1895, respectively

signed by the mark of Moose Dung the younger, and of each of the five other descendants of Moose Dung the elder, acknowledging the receipt from the Indian agent of one sixth of $200, " being my share for two quarters rental on lands leased to Ray W. Jones ; " and a lease, executed July 19, 1895, by Moose Dung the younger and the five other descendants of his father to the defendant, for twenty years from July 20, 1894, of the lot described in the lease to the defendant of that date, the defendant paying rent according to the conditions of that lease, as amended and approved by the Secretary of the Interior.

On the coming in of the court on September 3, 1895, the defendant's solicitor — pursuant to a notice given by him to the plaintiffs' solicitor on August 3, 1895, after all the evidence in the case had been taken — moved the court for leave to file a supplemental answer, alleging that Moose Dung the younger and the five other descendants of his father, above mentioned, were each entitled to one sixth of the land in controversy ; and had, in accordance with the lease made by Moose Dung the younger to the defendant in 1894 and its approval by the Secretary of the Interior, been paid their shares of the rent provided for in that lease and approval ; and had likewise themselves executed a lease ratifying and confirming that lease.

On September 9, 1895, the court denied the motion for leave to file the supplemental answer; on September 17, 1895, the cause was argued and submitted ; and on November 9, 1895, the court entered the final decree for the plaintiffs.

The present contention of the defendant that the right of the elder Moose Dung in the reservation passed, upon his death, not to his eldest son alone, but to the other children and grandchildren jointly with the eldest son, was clearly inadmissible under the allegations of the original answer. The question whether a supplemental answer should be allowed was a matter within the discretion of the court, largely depending upon the circumstances of the particular case. *Hardin* v. *Boyd*, 113 U. S. 756 ; *Smith* v. *Babcock*, 3 Sumner, 583. The reasons for denying the motion in this case are

not stated in the record.  They may have been the late stage
of the case at which the motion was. made, and a failure to
satisfy the court that the facts now attempted to be set up
were not known, or, at least, easily accessible, to the defend-
ant or his solicitor long before.    But as this court might,
even now, if justice appeared to require it, allow an amend-
ment of the pleadings, this part of the case may be more sat-
isfactorily disposed of by considering what the effect of those
facts would have been, had they been duly pleaded.  *Liver-*
*pool Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397, 447 ;  *Wig-*
*gins Ferry* v. *Ohio & Mississippi Railway*, 142 U. S. 396, 413,
414.

The Department of the Interior appears to have assumed
that, upon the death of Moose Dung the elder, in 1872, the
title in his land descended by law to his heirs general, and
not to his eldest son only.

But the elder Chief Moose. Dung being a member of an
Indian tribe, whose tribal organization was still recognized by
the Government of the United States, the right of inheritance
in his land, at the time of his death, was controlled by the
laws, usages and customs of the tribe, and not by the law of
the State of Minnesota, nor by any action of the Secretary of
the Interior.

In *United States* v. *Shanks*, (1870) 15 Minnesota, 369, it was
adjudged by the Supreme Court of Minnesota that a probate
court of the State had no jurisdiction over the estate of a
chief of a tribe of Chippewa Indians, to whom a section of
land, to be located by the Secretary of the Interior, had been
" granted in fee simple " by the treaty between the United
States and that tribe of May 7, 1864, (13 Stat. 693,) and had
accordingly been located and a patent therefor issued to him.
See also *Dole* v. *Irish*, (1848) 2 Barb. 639 ; *Hastings* v. *Farmer*,
(1850) 4 N. Y. 293, 294.

In one of the cases reported under the name of *The Kansas*
*Indians*, (1866) 5 Wall. 737, this court, reversing the judg-
ment of the Supreme Court of Kansas in *Blue Jacket* v.
*Johnson County*, 3 Kansas, 299, held that lands which, pursu-
ant to the treaty of May 10, 1854, between the United States

and the Shawnee nation of Indians, (10 Stat. 1063,) had been patented to a chief of that nation, were not subject to taxation by the State of Kansas so long as the tribal organization remained and was recognized by the political department of the Government ; and Mr. Justice Davis, in delivering judgment, said: "This people have their own customs and laws by which they are governed. Because some of those customs have been abandoned, owing to the proximity of their white neighbors, may be an evidence of the superior influence of our race, but does not tend to prove that their tribal organization is not preserved. There is no evidence in the record to show that the Indians with separate estates have not the same rights in the tribe as those whose estates are held in common." " As long as the United States recognize their national character, they are under the protection of treaties and the laws of Congress, and their property is withdrawn from the operation of state laws." 5 Wall. 756, 757. See also the opinion delivered by Judge Woods, with the concurrence of Mr. Justice Harlan, in the Circuit Court, in *Waupemanqua* v. *Aldrich*, (1886) 28 Fed. Rep. 489, 495.

Following that decision of this court, it was held by the Supreme Court of Kansas, in an opinion delivered by Mr. Justice Brewer, that land patented to an Indian woman of the Shawnee tribe under the treaty of 1854, descended, upon her death, according to the law of her tribe, and not according to the Kansas statute of descents. *Brown* v. *Steele*, (1880) 23 Kansas, 672.

In *Richardville* v. *Thorp*, (1886) 28 Fed. Rep. 52, which concerned the inheritance of land patented by the United States to a member of the confederated tribes of Kaskaskia, Peoria, Pinkeshaw and Wea Indians, and in which there was no evidence of any particular law or custom of those tribes, it was held that the rightful heirs of the patentee might maintain their title in the Circuit Court of the United States for the District of Kansas against one claiming under a deed from two of those heirs, approved by the Secretary of the Interior upon a certificate of two chiefs of the tribe that the two grantors were the sole heirs of the patentee; Mr. Justice,

Brewer, then Circuit Judge, saying that the Secretary of the Interior "had no judicial power to adjudge a forfeiture, to decide questions of inheritance, or to divest the owner of his title without his knowledge or consent."

Upon the evidence contained in this record, it is quite clear that, by the laws, usages and customs of the Chippewa Indians, old Moose Dung's eldest son and successor as chief inherited the land of his father, to the exclusion of other descendants. Both the half-breed Morrison and the younger Moose Dung, being fully examined on this point, so testified; and there was no direct testimony to the contrary. Morrison had lived with the Red Lake band of Chippewas all his life, spoke their language, and knew their laws, customs and usages; and there is nothing whatever in the case that throws any doubt on the trustworthiness of his testimony. The only matters that can be supposed to lessen the weight of Moose Dung's testimony are an affidavit, a receipt and a lease, each signed with his mark in 1895, more than three years after the lease to the plaintiffs, and wholly incompetent as independent evidence against them. That affidavit, in which he stated that the two daughters and the three grandchildren were the only legal heirs of his father beside himself and were entitled to share with him in the estate, was procured from him by the Indian agent under direction of the Secretary of the Interior, and, as well as the receipt, was evidently considered by him as mere matter of form with which he was obliged to comply in order to get any part of the rent under the lease of 1894. That it made little impression on his mind is evident from the fact that, when afterwards examined as a witness in this case, in the presence of the counsel for both parties, he testified that no one had ever said anything to him about the daughters and grandchildren having some interest in the land. And it is not without significance that the other chiefs and headmen of the tribe, from whom, under the direction of the Secretary of the Interior, affidavits were likewise obtained to the relationship between old Moose Dung and his six descendants, said nothing, and do not appear to have been asked anything, as to the right of inheritance, or

as to the laws, customs and usages of the Indians upon that subject.

The title to the strip of land in controversy, having been granted by the United States to the elder chief Moose Dung by the treaty itself, and having descended, upon his death, by the laws, customs and usages of the tribe, to his eldest son and successor as chief, Moose Dung the younger, passed by the lease executed by the latter in 1891 to the plaintiffs for the term of that lease; and their rights under that lease could not be divested by any subsequent action of the lessor, or of Congress, or of the Executive Departments. The construction of treaties is the peculiar province of the judiciary; and, except in cases purely political, Congress has no constitutional power to settle the rights under a treaty, or to affect titles already granted by the treaty itself. *Wilson* v. *Wall*, 6 Wall. 83, 89; *Reichart* v. *Felps*, 6 Wall. 160; *Smith* v. *Stevens*, 10 Wall. 321, 327; *Holden* v. *Joy*, 17 Wall. 211, 247.

The Congressional resolution of 1894, and the subsequent proceedings in the Department of the Interior, must therefore be held to be of no effect upon the rights previously acquired by the plaintiffs by the lease to them from the younger chief; and the

*Decree is affirmed.*